124 Cal.App.3d 653 (1981)
177 Cal. Rptr. 546
In re JOSEPH E. et al., Minors.
DEPARTMENT OF SOCIAL SERVICES, Petitioner and Respondent,
v.
BENJAMIN W. et al., Objectors and Appellants.
Docket No. 45973.
Court of Appeals of California, First District, Division One.
October 19, 1981.
*656 COUNSEL
Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Richard S. Kessler, Deputy State Public Defender, for Objectors and Appellants.
James P. Botz, County Counsel, and Richard W. Ergo, Deputy County Counsel, for Petitioner and Respondent.
OPINION
ELKINGTON, J.
Patricia H. (Patricia) is the natural mother of Joseph E. (Joseph), a young child. She is also the natural mother of Sylvia W. (Sylvia), Joseph's younger half-sister, whose natural father is Benjamin W. (Benjamin). On August 9, 1973, Joseph and Sylvia were adjudged dependent children of the juvenile court. Joseph was placed with foster parents in April of 1974, and Sylvia has resided in another foster home since January of 1976. The respective foster parents wish to adopt the children presently in their care.
The California State Department of Health petitioned the superior court, under Civil Code section 232, for an order declaring Joseph and Sylvia free from parental custody and control. Patricia, the mother of both, and Benjamin, the father of Sylvia, resisted the petition. Following a trial, the superior court entered judgment as prayed by the department. Patricia and Benjamin have appealed.
We affirm the judgment for the reasons as follow.
The several appellate contentions are stated as phrased by Patricia and Benjamin.
*657 I. (1) Contention: "The judgment must be reversed insofar as it severs the parental relationship between Benjamin ... and Sylvia ... because appellant ... did not receive proper notice of the original juvenile court dependency proceeding (Welf. & Inst. Code, § 300)."
This complaint is made by Benjamin alone; Patricia had concededly received the proper notice. He contends that the superior court proceedings were invalid, because of lack of notice of "the original juvenile court dependency hearing" (italics added) several years earlier.
We observe that the claimed deficiency was not pointed out or relied upon in the superior court, and appears to be raised for the first time on this appeal; at least no contrary record reference is made. (See rule 15(a), Cal. Rules of Court.) "That the statement in the briefs of any matter in the record must be supported by an appropriate reference to the record is well established." (Robison v. Hanley (1955) 136 Cal. App.2d 820, 827 [289 P.2d 560].) We apply the rule "that points not urged in the trial court may not be urged for the first time on appeal." (Damiani v. Albert (1957) 48 Cal.2d 15, 18 [306 P.2d 780].)
It is further noted that Benjamin makes no contention that any such procedural shortcoming attended the instant superior court proceedings.
II. (2) Contention: "The evidence was insufficient to support the trial court's finding that the minors were cruelly treated or neglected within the meaning of Civil Code section 232, subdivision (a)(2)."
We add to this inquiry another issue, the resolution of which is essential in cases such as this. As stated by Civil Code section 4600, subdivision (c): "Before the court makes any order awarding custody to a person or persons other than a parent, without the consent of the parents, it shall make a finding that an award of custody to a parent would be detrimental to the child and the award to a nonparent is required to serve the best interests of the child."
Civil Code section 232 provides: "(a) An action may be brought for the purpose of having any person under the age of 18 years declared free from the custody and control of either or both of his parents when such person comes within any of the following descriptions: ... (2) Who has been cruelly treated or neglected by either or both of his parents, if such person has been a dependent child of the juvenile court, *658 and such parent or parents have been deprived of his custody for the period of one year prior to the filing of a petition praying that he be declared free from the custody and control of such cruel or neglectful parent or parents."
(It is uncontroverted that the parents of this case had been deprived of the custody of Joseph and Sylvia "for the period of one year prior to the filing of [the instant] petition....")
In our inquiry we are further guided by two recent cases of the state's high court, In re Carmaleta B. (1978) 21 Cal.3d 482 [146 Cal. Rptr. 623, 579 P.2d 514], and In re Angelia P. (1981) 28 Cal.3d 908 [171 Cal. Rptr. 637, 623 P.2d 198].
In re Carmaleta B. teaches the following (the italics are added):
"Parenting is a fundamental right, and accordingly, is disturbed only in extreme cases of persons acting in a fashion incompatible with parenthood. Thus, the court in In re T.M.R. (1974) 41 Cal. App.3d 694, 703 [116 Cal. Rptr. 292], held: `The relationship of ... natural parent ... [and] ... children is a vital human relationship which has far-reaching implications for the growth and development of the child.... Thus, the involuntary termination of that relationship by state action must be viewed as a drastic remedy which should be resorted to only in extreme cases of neglect or abandonment.' ... [¶] Our decision in In re B.G. (1974) 11 Cal.3d 679 [114 Cal. Rptr. 444, 523 P.2d 244], emphasized the gravity of this right, holding that the doctrine preferring parental custody was not affected by the enactment of section 4600 except to focus `attention not on the unfilness of the parent but the detriment to the child....' B.G. permits custody to go to nonparents `... only upon a clear showing that such award is essential to avert harm to the child.' (11 Cal.3d p. 699.) [¶] In light of this legislative and judicial policy, we must determine if the trial court's findings under subdivisions (a)(2) and (a)(6) were supported by substantial evidence such that the situation contemplated by the statute arises, and severing the parental relationship becomes the least detrimental alternative for the children." (21 Cal.3d, p. 489) "It is well settled that an order to free a child from parental custody and control must rest on present circumstances as well as past acts although such prior acts are evidence which may be considered by the court in deciding whether there is sufficient showing to justify the order." (Id., p. 493.)
*659 Elaborating, In re Angelia P. states (the italics are added):
"We have recently acknowledged that `Parenting is a fundamental right, and accordingly, is disturbed only in extreme cases of persons acting in a fashion incompatible with parenthood.' ... Nonetheless, parental rights are not absolute and we must seek a consistent and reasonable approach to the varying rights involved when the state, by intervention, disturbs natural familial relationships. To that end we examine the nature of the affected rights. [¶] Historically, the parental right or preference doctrine originated with the concept that a parent's right `in his child was akin to that of a property owner in his chattel' ..., from which it followed that the parent's interests in custody were of primary consideration.... This principle survives, albeit in modified form, based on `the assumption that a natural parent will most adequately fulfill his child's needs.' ... [¶] More recently the primacy of another consideration has evolved in the reasoning of courts, legislatures and commentators which have focused on the child's well-being, seeking to ascertain the `best interest' of and the `least detrimental alternative to the child.' Our Legislature's concern is manifest in its direction that the statutes concerning the termination of parental rights `shall be liberally construed to serve and protect the interests and welfare of the child.'" (28 Cal.3d, p. 916.) "[As] recently expressed, `the goal of [§ 232] is to promote the welfare of the child; and the state as a parens patriae has not only a "compelling interest" but also has a "duty" to sever parental bonds once a situation contemplated by the statute arises.'" (Id., p. 919.)
Among others, the superior court made the following findings of fact.
As to Joseph 
"Prior to August 9, 1973, Joseph was neglected by his mother, resulting in his malnutrition with possible brain damage.
"It would be detrimental to Joseph now or in the future to be returned to the custody of his mother or of his father or both of them.
"It is necessary to serve and promote the welfare and interests of Joseph that he be declared free from the parental custody and control of his mother and father.
*660 "Joseph has resided in the foster home of ... since April 14, 1974, and it is in his best interests that he continue to reside with them on a permanent basis.
"From and after August 9, 1973, the mother and father of Joseph have failed, and each of them has failed, and they are, and each of them is likely in the future to fail to: (a) provide a home for Joseph; (b) provide care and control for Joseph; (c) maintain an adequate parental relationship with Joseph; and (d) maintain continuous contact with Joseph, which from and after August 23, 1973, they were, and each of them was, able to do."
As to Sylvia 
"Prior to August 9, 1973, Sylvia had been neglected by her mother and her father, resulting in her hospitalization where her condition was severe dehydration, secondary to gastro-enteritis, the onset of which had occurred days prior to her hospitalization.
"It would be detrimental to Sylvia now or in the future to be returned to the custody of her mother or of her father or both of them.
"It is necessary to serve and promote the welfare and interests of Sylvia that she be declared free from the parental custody and control of [her] mother and father.
"Sylvia has resided in the foster home of ... since January 28, 1976, and it is in her best interests that she remain there on a permanent basis.
"From and after August 23, 1973, the mother and father of Sylvia have failed, and each of them has failed, and they are likely and each of them is likely in the future to fail to: (a) provide a home for Sylvia; (b) provide care and control for Sylvia; (c) maintain an adequate parental relationship with Sylvia; and (d) maintain continuous contact with Sylvia, which from and after August 23, 1973, they were, and each of them was, able to do."
Beyond any doubt the trial court's findings of fact comport with the legislative requirements of Civil Code sections 232 and 4600, subdivision (c), including findings that the children were "cruelly treated or neglected by either or both [their] parents," and that, as to each child, *661 "an award of custody to a parent would be detrimental to the child and the award to a nonparent is required to serve the best interests of the child." They also meet the essential demands of In re Carmaleta B. and In re Angelia P. that the trial court "ascertain the `best interest' of and the `least detrimental alternative to the child.'"
And we observe that the findings were expressly made on "proof beyond a reasonable doubt," a stricter standard than that of "clear and convincing evidence," as is ordinarily required in such cases. (See In re Angelia P., supra, 28 Cal.3d 908, passim.)
Our remaining instant inquiry is whether the above findings of fact were supported by substantial evidence. The test on appeal in such cases is whether substantial evidence supports the conclusion of the trier of fact, not whether the evidence proves essential facts beyond a reasonable doubt, or by clear and convincing evidence. The appellate court must determine whether a reasonable trier of fact, on the whole evidence, could have found such a degree of proof. (See People v. Johnson (1980) 26 Cal.3d 557, 576 [162 Cal. Rptr. 431, 606 P.2d 738].)
We look to the largely uncontroverted evidence as it reasonably could have been, and presumably was, found true by the superior court.
Patricia was the unmarried mother of four young children, each with a different father. She had met Benjamin in 1970 and sometime later they commenced living together. Both Patricia and Benjamin were "heavy drinkers" and their living arrangement was a stormy one, attended by much violence. A public health nurse had observed Patricia with eyes that "were black and blue, and she didn't want to discuss" it. Another injury was explained by Patricia as "he was going to hit the sister's car [with a roller skate], and I got in the way, and he hit me instead." As conceded by Patricia, when Sylvia was an infant "Benny hit the baby in the face...." And once, when Benjamin had found Patricia in bed with another man, he had stabbed her viciously with a pair of scissors. The "excessive" drinking and violence, a social worker said, "was a real concern of mine."
The couple had separated several times, once for as long as three months, and their relationship was patently on an unstable basis.
Joseph was born February 15, 1972, and the whereabouts of his natural father were unknown. A year later, February 18, 1973, Sylvia, *662 whose father, as noted, was Benjamin, was born; she was the fourth of the household's siblings.
Patricia's and Benjamin's care and treatment of the four children had come to the attention of the county's "public health" and "child protective" services. Each of the four had recurrent physical and emotional problems which called for professional social, and medical and hospital, services. But professional advice and admonitions concerning the children were largely ignored. Patricia would not ordinarily keep her appointments. And when health or welfare workers tried to make home visits, Patricia and Benjamin were usually not there. Sometimes efforts were made to find Patricia through "neighbors and friends, but we weren't able to locate her." On one rare successful home visit all of the children "were sick that day.... They looked ill, and I recommended that they go to Community Hospital to see the doctor at family practice." The recommendation appears to have been unfollowed; it was Patricia's "life style" to avoid "authority, which includes doctors and hospitals."
This lack of proper care and attention was soon emphasized to the county authorities. Joseph was brought to the county hospital. He had "a temperature of a hundred and five and a history of convulsion, and ... the physical examination showed a child in ill health with pneumonia, obvious failure to thrive with slow development." He had "slow motor coordination." And he "had an extended [sic; distended?] stomach," his "arms and legs were real thin," he "was suffering from malnutrition" and "there was a possibility of brain damage, ..."
Then soon after Sylvia's birth, she was brought to the hospital, not by her father or mother, but by Benjamin's brother who thought she needed immediate attention. Explaining the incident later, Benjamin said, "She looked all right to me."
At the hospital Sylvia was found to be "essentially near death," "She was very, very ill." She had apparently suffered "seizures" and "convulsions," and possible "brain damage" was indicated. At one time "the baby stopped breathing and, apparently, the heart rate stopped with the pulse not being present, and the baby was immediately resuscitated by virtue of putting a small tube in its air passage, and the baby was artificially ventilated, artificially breathed for a period of time and given some Adrenalin direction into the heart and also given some other *663 medication, ..." And she was suffering from severe "dehydration," "bowel infection," "vomiting," and "diarrhea."
During Sylvia's extended stay in the hospital Benjamin did not visit her, nor did he try to learn about her condition by telephoning the hospital or doctors.
Not dissimilar episodes attended the other two children of Patricia.
These incidents triggered prompt action of the county health, social, and "child protective" services. Each of Patricia's four children, including Benjamin's Sylvia, was adjudged "a dependent child of the juvenile court." And each was placed by that court in the custody of willing foster parents.
Upon going to live in their respective foster homes, Joseph and Sylvia were, as might be expected, in poor physical condition, and they showed symptoms of deep emotional distress and bewilderment. Although Patricia and Benjamin were in no way discouraged from visiting with the children they showed little interest in them. Over a four-year period, although living in the same county, they had visited Joseph twice, the last visit about two years before the trial. "Joey had not seen his mom for a year and three months before that; he didn't remember who she was, ..." After the instant superior court proceedings were started Sylvia's foster parents brought her into a social worker's office for a visit with Patricia. Except for that visit they had never, in any way, been contacted by Patricia or Benjamin in reference to Sylvia.
(We observe no contention of Patricia or Benjamin that either was, in any degree whatever, prevented or discouraged by anyone, from seeing or visiting the children.)
Following the two children's placement in foster homes the county child protective service agency entered into a so-called "contract" with Patricia and Benjamin covering minimum and reasonable home conditions, the observance of which would result in a recommendation that the children's custody be restored to them. The record reasonably indicates that no attempt was made to abide by the agreement.
At the time of the trial, Joseph and Sylvia appeared to be in good health, and their earlier emotional problems and symptoms had largely, if not entirely, disappeared. They were happy with their foster brothers *664 and sisters, and with their foster parents who, obviously loving them as their own, wished to adopt them.
We opine that from the above-related evidence the superior court, sitting as a trier of fact, reasonably found support, beyond a reasonable doubt, for its several findings of fact. And, it is noted that the trial court's findings rested upon "present circumstances as well as past acts" of Patricia and Benjamin, in accordance with the additional requirement of In re Carmaleta B., supra, 21 Cal.3d 482, 493.
The instant contention is therefore invalid.
III. Contention: "The evidence was insufficient to support the trial court's findings pursuant to Civil Code section 232, subdivision (a)(7)."
Section 232, subdivision (a)(7), as relevant to this contention, requires for the statute's application, a judicial finding "by clear and convincing evidence that return of the child to his parent or parents would be detrimental to the child and that the parent or parents have failed during such period, and are likely to fail in the future, to do the following: (i) Provide a home for the child; (ii) Provide care and control for the child; and (iii) Maintain an adequate parental relationship with the child." It will be recalled, as conceded by the contention, that the court so found. Indeed, as has been pointed out, it was so found under the higher standard of "proof beyond a reasonable doubt."
We are of the opinion, for the reasons stated in part II above, that the instantly criticized findings were abundantly supported by substantial evidence.
IV. Contention: "Assuming arguendo that it was essential for the safety and well-being of Sylvia and Joey that they not be in appellants' physical custody, petitioner has not proven the need to terminate all residual parental rights."
The argument runs contrary to the letter, spirit, and rationale of Civil Code section 232, that upon the high degree of proof there provided for, a child be declared "free from the custody and control of either or both of his parents...." (Italics added.)
V. (3) Contention: "The trial court erred in finding that the state and local social services agencies provided adequate child protective services *665 before depriving appellants of the custody and control of their children."
Here reliance is upon In re Susan M. (1975) 53 Cal. App.3d 300, 310 [125 Cal. Rptr. 707], holding "that all avenues should be explored by the courts, the state and state agencies before a child is declared free from the custody and control of its parents and placed for adoption." The holding, we think, reasonably paraphrases the above-noted language of In re Carmaleta B., supra, 21 Cal.3d 482, 489, requiring a high degree of proof "that the situation contemplated by the statute arises, and [that] severing the parental relationship becomes the least detrimental alternative for the children." As pointed out in part II above such a degree of proof was here made in the superior court.
The judgment is affirmed.
Racanelli, P.J., and Newsom, J., concurred.