[No. H004397. Sixth Dist. June 27, 1989.]

In re JONATHAN R., a Minor.
SANTA CRUZ COUNTY HUMAN RESOURCES AGENCY,
Petitioner and Respondent, v.
KELLY R. et al., Objectors and Appellants.

1216

**COUNSEL**

Stanley K. Yim, Michael Kresser and James W. Haworth, under appointments by the Court of Appeal, for Objectors and Appellants.

Dwight L. Herr, County Counsel, and Jane M. Scott, Assistant County Counsel, for Petitioner and Respondent.

**OPINION**

**PREMO, J.**—Kelly and Reginald R. appeal from a judgment declaring their son, Jonathan R., permanently free from their custody and control under Civil Code section 232, subdivision (a)(7).[1] On appeal they contend that (1) the trial court ignored present circumstances in its finding that returning the child to their custody would be detrimental to the child, and that they were not likely to maintain an adequate parental relationship with him in the future; and (2) no substantial evidence supports the court's finding that they were provided reasonable reunification services, or that severing the parental relationship was the least detrimental alternative for the minor. We affirm.

Jonathan R. first came to the attention of the Santa Cruz County Human Resources Agency (HRA) at seven months of age, after Kelly inflicted

---

[1] Further statutory references are to the Civil Code unless otherwise specified.

bruises on his face and cigarette burns on his face and hands. The infant also had severe diaper rash and the milk in his bottle was spoiled.

The relationship between his parents was, as the social worker called it, "complicated." Kelly, age 20, had longstanding emotional problems involving wrist slashing and temper tantrums, exacerbated by her use of drugs. At the age of 16 she had been placed in Reginald's home as a foster child. Reginald, 59, was married at that time with 5 adult children. As a result of the sexual relationship that developed between Kelly and Reginald, he pled guilty to statutory rape. Both Kelly and Reginald are hearing impaired, and the minor was evaluated as profoundly deaf.

On December 4, 1985, the parents stipulated to juvenile court jurisdiction, and the minor was declared a dependent child under Welfare and Institutions Code section 300, subdivisions (a) and (d). The reunification plan for Kelly included regular visitation, cessation of drug use, individual counseling, and parenting classes. Reginald was initially not offered a service plan, because his paternity, which had been questioned by Kelly, was not confirmed until September 1986.

The most significant obstacle to reunification, according to the personnel involved in the case, was the volatile relationship between the parents. Their interactions were hostile and on occasion violent; at the same time the relationship appeared to be one of mutual dependence. Kelly's difficulties with drugs and "impulsiveness" and Reginald's criticism of her "inadequacies" aggravated their problems. On more than one occasion during dependency the court granted mutual restraining orders, which were subsequently violated, as the parents continued to see each other.

The social worker felt that the conflict and violence between them "definitely affected Kelly's stress level and affected her judgment with regard to Jonathan." Accordingly, Kelly was encouraged to discontinue her relationship with Reginald if she wanted the minor returned to her.

During the course of dependency Kelly made considerable progress in her reunification efforts. She was a regular participant in parenting classes, she attended drug and mental health counseling, and she visited with the minor for increasingly longer periods. By the twelve-month review and permanency planning hearing, Kelly had moved to her own home and was caring for the minor two days and one night weekly. The social worker felt that Kelly had substantially complied with the service agreement; however, she had not yet "resolved" her relationship with Reginald. For that reason the social worker recommended that Jonathan not be returned to parental custody, but she anticipated his return to Kelly within the next six months.

A new service plan was developed which focused on increasing visitation time and the resolution of her relationship with Reginald.

A reunification plan was also offered Reginald, who by this time had obtained a final dissolution from his wife. His service plan required regular (at least monthly) visitation with the minor and couples counseling with Kelly. He was also required to "respect Kelly's decision regarding their relationship," and refrain from harassing her. Reginald did not, however, pursue official visitation; instead, he saw Jonathan while the child was in Kelly's care. There was some evidence that Reginald was interested in Jonathan only as a vehicle for seeing Kelly.

One week before the eighteen-month review and permanency planning hearing was scheduled to occur, a joint decision was made by Kelly's social worker and three counselors to give her custody of Jonathan on a trial basis. By this time Kelly had maintained a separate residence from Reginald, and had conveyed the impression that their relationship had ended with acceptance on both sides. Kelly had also stated that she was no longer using drugs and "fe[lt] better." Although there were still concerns about her impulsivity and judgment, the consensus was that she should be given an opportunity to try parenting Jonathan.

On April 7, 1987, Kelly assumed custody of Jonathan. The social worker prepared a report recommending the return of the minor under the supervision of HRA. On April 13, the day that report was filed, Reginald brought the minor back to the agency. He advised the social worker on duty that he and Kelly had argued; that she had driven away, leaving Jonathan with him; and that he was unable to care for the child. The 18-month hearing, scheduled for April 14, was continued to May 5, 1987, pending a reevaluation of the situation by the counselors and agency personnel involved. The consensus thereafter was that Kelly was not ready to assume custody of Jonathan; that she had not been consistent in following through with the positive behavioral changes she had made, particularly in impulse control and drug use; and that she seemed unable to apply the parenting skills she had learned in her classes. The social worker noted that contrary to her earlier representations, Kelly had in fact maintained a relationship with Reginald, and that it continued to be a volatile one.

On July 9, 1987, the permanency planning hearing was held. Both parents stipulated to HRA's recommendation of adoption as a permanent plan. Accordingly, the court found that an immediate return of the minor to his parents would create a substantial risk of detriment to his physical and emotional well-being, and that there was no substantial probability of reunification within six months. The court authorized county counsel to ini-

tiate proceedings to declare the minor permanently free from their custody and control in order to facilitate a plan for adoption.

On August 28, 1987, a petition was filed under section 232, subdivision (a)(7), to terminate appellants' parental rights to the minor. The hearing, however, did not take place until seven months later, on March 24, 1988. At the hearing both parents and Kelly's mother testified that the relationship between Kelly and Reginald had changed dramatically. The two had married in July 1987, and were presently enjoying a more harmonious relationship. Kelly had not used drugs for 10 months, and her behavior had become more stable, with better control of her emotions. Accordingly, Kelly's attorney urged the court to base its decision on the parents' recent accomplishments rather than on their failings during the reunification period.

The court initially was responsive to this argument, and stated its inclination to extend the review period "to see how, in fact, they're doing." However, after hearing argument from county counsel, the court granted the section 232 petition. Both parents separately appeal from the resulting order.

### DISCUSSION

#### 1. Reliance on Unsworn Statement

Kelly first asserts that the trial court abused its discretion by basing its decision in part on a statement by county counsel during closing argument that the foster parents were expected to move out of the county in the near future. We find no basis for reversal in this contention. First, as respondent points out, there was no objection to this statement at trial. (*In re Lynna B.* (1979) 92 Cal.App.3d 682, 703 [155 Cal.Rptr. 256].) Second, although the court did appear influenced by the prospective move at the hearing, its statement of decision does not reflect any reliance on this information in rendering its decision.

#### 2. Adequacy of Reunification Services

Both parents contend that the trial court erred in making the required finding that they had been offered or provided reasonable reunification services. Reginald argues that, because the agency was "biased" against reuniting him with the minor, it did little to help him implement his service plan. Kelly complains only that it was "unreasonable" to deny her requests for visitation with Jonathan during the period between the permanency planning hearing and the section 232 hearing.

Neither position has merit. The record reveals that the service plan offered to Reginald was found "appropriate and necessary" by the juvenile court, but that Reginald showed little interest in complying with its requirements. ■ Reunification services are voluntary, and cannot be forced on an unwilling or indifferent parent. (*In re Lynna B., supra,* 92 Cal.App.3d at p. 702.) Regarding Kelly's complaint, the Legislature has made it clear that mandatory reunification services are not to exceed 18 months. (Welf. & Inst. Code, § 361.5, subd. (a); *In re Michael S.* (1987) 188 Cal.App.3d 1448, 1461, fn. 4 [234 Cal.Rptr. 84].) Neither the court nor HRA was under a duty to provide for visitation once this period was over. To have ordered further services once a permanent plan for adoption had been agreed upon by all parties would have been, in the adoptions worker's opinion, contrary to the minor's best interests.

### 3. *Findings of Detriment and Future Failure*

■ "Parenting is a fundamental right, and accordingly, is disturbed only in extreme cases of persons acting in a fashion incompatible with parenthood." (*In re Carmaleta B.* (1978) 21 Cal.3d 482, 489 [146 Cal.Rptr. 623, 579 P.2d 514].) In order to terminate parental rights under section 232, subdivision (a)(7), the court must find by clear and convincing evidence that the child has been in out-of-home placement for one year, that return of the child to the parents would be detrimental to the child, and that the parents have failed during that period and are likely to fail in the future to maintain an adequate parental relationship with the child.

Appellants' primary contention is that there was insufficient evidence to support the trial court's findings that it would be detrimental to return Jonathan to their custody or that they are likely to fail in the future to maintain an adequate parental relationship with him. Underlying this contention is their assertion that the trial court abused its discretion by ignoring the uncontradicted evidence of their present circumstances and basing its decision solely on the events of the reunification period.

■ In *Carmaleta B., supra,* 21 Cal.3d at page 493, the Supreme Court stated that an order freeing a child from parental custody must rest on present circumstances as well as past acts. Although that decision and those that followed have generally applied this rule to cases involving neglect under section 232, subdivision (a)(2) (see, e.g., *In re Terry E.* (1986) 180 Cal.App.3d 932, 949 [225 Cal.Rptr. 803]; *In re Joseph E.* (1981) 124 Cal.App.3d 653, 664 [177 Cal.Rptr. 546]), we can find no reason why it should not apply equally to situations involving section 232, subdivision (a)(7). Thus, the parents were "entitled to have the circumstances leading to

the [permanency planning] order reviewed in the light of subsequent events . . . ." (*In re Morrow* (1970) 9 Cal.App.3d 39, 55 [88 Cal.Rptr. 142].)

In cases such as the one at bar, where the section 232 petition was not heard until long after the permanency planning hearing, it is particularly important to examine present circumstances to determine whether the problems that led to the initiation of section 232 proceedings have been corrected. Without considering the current situation of the parents, it would be impossible for the court to make the required determination that they are likely to fail in the future to maintain an adequate parental relationship with the child. Thus, in these situations, it would be incorrect to assume that "[u]nquestionably the parents' 'track record' prior to the hearing is the best indication of such a likelihood." (*In re Norma M.* (1978) 77 Cal.App.3d 110, 116 [143 Cal.Rptr. 412].)

Of course, an improvement in the circumstances of the parents cannot alone justify a return to parental custody. Present circumstances are but one of many factors bearing on the question of whether returning a child to its parents would be detrimental to the child's welfare. It is for the trial court to weigh this evidence against the evidence of the parents' efforts, accomplishments, and failures during the reunification period. (*In re Morrow, supra,* 9 Cal.App.3d at p. 57.) Furthermore, a finding that improvements in parents' circumstances outweigh the failures during reunification does not guarantee return of the child to the parents. The primary focus of termination proceedings is no longer on parental fitness, but on whether a return of custody to the parents would be detrimental to the child, and whether an award to a nonparent is required to serve the child's best interests. (*In re B. G.* (1974) 11 Cal.3d 679, 698 [114 Cal.Rptr. 444, 523 P.2d 244]; *In re B. J. B.* (1986) 185 Cal.App.3d 1201, 1209 [230 Cal.Rptr. 332].) Even if parents have corrected their previous deficiencies, a court may still refuse to return a child to parental custody if, for example, the child is firmly bonded to the foster parents. (See, e.g., *In re B. G., supra,* 11 Cal.3d at p. 699.)

In the case before us, the appellants argue that the trial court expressly ignored their current circumstances in favor of an exclusive focus on the previous reunification period. They point out that the judge initially preferred to grant six additional months of review in view of the progress they had made since the permanency planning hearing. According to their account of the events that followed, county counsel then "convinced the court that the parents' present circumstances should not be considered in the Civil Code section 232, (a)(7) proceeding, and that the court's exclusive focus should be on the period up to and including the permanency planning hearing."

We reject appellants' representation of the events at the hearing. The essence of county counsel's argument was to remind the court to focus on the interests of the child. Her position was not that the court was entitled to examine only the reunification period, but that the parents' "track record" was the best indicator of future parenting ability. The court did not ignore present circumstances; on the contrary, it gave them careful thought. It chose, however, to accord greater weight to the 18 months during which services were provided, reasoning that this period was more informative than "the time when they didn't have a child to burden them." The court repeatedly stated that it was considering the interests and welfare of the child. We see no abuse of discretion in this exercise of the court's judgment.

#### 4. *Least Detrimental Alternative*

■ Appellants' final contention is that the trial court failed to select the least detrimental alternative—according to Kelly, an additional six months of review to permit further assessment of the parents' progress. This result would have entailed an additional period of foster care for the minor, who by the time of the hearing was almost three years old. He has spent most of his life in foster care. There is no evidence in the record that his foster parents were prepared to adopt him, or that another adoptive family was available.[2] "Such uncertainty conflicts with the intent of section 232 to afford children during their formative years a permanent, secure, and stable environment." (*In re Angelia P.* (1981) 28 Cal.3d 908, 923 [171 Cal.Rptr. 637, 623 P.2d 198]; see also *In re Micah S.* (1988) 198 Cal.App.3d 557, 565-567 [243 Cal.Rptr. 756], conc. opn. of Brauer, J.)

The hearing on the section 232 petition had already been delayed far beyond excusable limits. Section 232.3 expressly discourages continuances, as does Welfare and Institutions Code section 352. Further delays would only have compromised Jonathan's chances of finding a permanent and stable home. The court acted properly in refusing to prolong his foster child status in the interest of an uncertain result.

The judgment is affirmed.

Capaccioli, J., concurred.

**BRAUER, Acting P. J.,** Concurring.—I agree with the disposition and most of what is said in the opinion of the court. I part company with my

---

[2] At the section 232 hearing the adoptions worker made a passing reference to the foster parents' expression of interest in adopting Jonathan. However, no social worker's reports mention any request to adopt him, nor is there any evidence that they had been accepted as a prospective adoptive placement.

cohorts, however, in their characterization of the trial court's refusal to extend the review period as being within the bounds of discretion. The implication is that the judge could have gone either way. To the contrary, I suggest that any decision other than that made would have been error.

Whatever the focus on "present circumstances" may be in other contexts and under cases which the majority concedes are not directly in point, there can be no question that what the parents here sought, and what the trial court first contemplated granting, was an extension of the period looking to possible reunification. Such extension would have been against law and against sound policy.

Welfare and Institutions Code section 361.5 calls for reunification services for "a maximum time period not to exceed 12 months." At most, that period may be extended for an additional six months. Welfare and Institutions Code section 366.25 directs that "in order to provide stable, permanent homes for children, a court shall, if the minor cannot be returned home pursuant to subdivision (e) of section 366.2, conduct a permanency planning hearing . . . ." That section goes on to authorize further visitation with the parents only where the minor is not adoptable (Compare § 366.25, subd. (d)(1) with (d)(2)).[1] Here the court made the appropriate findings on July 9, 1987, that return to the parents would be detrimental to the child, that there was no substantial probability of reunification within six months and that the child was adoptable. In the face of the most strongly expressed legislative opposition to continuances in this field, as pointed out in the opinion of the court, the Civil Code section 232 hearing was not held until nine months later.

It is clear that the statutory scheme gives the parents 12 and at most 18 months to prove themselves. Thereafter, if the child is adoptable, permanency planning pursues the aim of a new bonding. Civil Code section 232.3, subdivision (a) leaves no room for equivocation: "It is the public policy of this state that judicial proceedings to declare a child free from parental custody and control shall be fully determined as expeditiously as possible."

I have previously had occasion to rail against the devastatingly harmful effect of delay upon children left in limbo. (*In re Micah S.* (1988) 198 Cal.App.3d 557, 564-568 [243 Cal.Rptr. 756].) Once adoption is determined upon, further contact with the natural parents merely exposes an already

---

[1] The authorization for parental visitation in subdivision (d)(2) with regard to unadoptable children was first enacted in 1988. Theretofore, there were no provisions for such visitation after the permanency planning hearing.

bruised and fragile psyche to additional stress and conflict. It still further decreases the chances of this small human being for a glimmer of future happiness.

A petition for a rehearing was denied July 18, 1989, and appellants' petition for review by the Supreme Court was denied September 20, 1989.