[No. G021127. Fourth Dist., Div. Three. Nov. 6, 1997.]

In re CYNTHIA C., a Person Coming Under the Juvenile Court Law.
ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and
Respondent, v.
SHARON C., Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

----

   \*Pursuant to California Rules of Court, rule 976(b) parts IV., V. and VI. (with the
exception of the dispositional paragraph of part VI.) of this opinion are not published as they
do not meet the standards for publication.

## COUNSEL

John L. Dodd and Patricia Ihara, under appointments by the Court of Appeal, for Defendant and Appellant.

Laurence M. Watson, County Counsel, and Mark R. Howe, Deputy County Counsel, for Plaintiff and Respondent.

Harold LaFlamme and Craig E. Arthur, under appointments by the Court of Appeal, for Minor.

## OPINION

**SONENSHINE, J.**—Sharon C., the minor's paternal aunt and de facto parent, appeals from the juvenile court's order of December 13, 1996, denying her petition for modification under Welfare and Institutions Code section 388.[1] She contends Orange County Social Services Agency (SSA) improperly removed then five-year-old Cynthia C. from her home without due process of law. She further challenges the court's denial of her requests for an ordered placement and a bonding study.

We partially publish our opinion because we decide an issue of first impression—whether, when there has been no ordered placement with a specific caretaker, section 387 requires SSA, before removing the child, to file a supplemental petition, give notice of a hearing and prove the existence of conditions which constitute a substantial risk of harm to the child. As we will explain, the answer is, "No." When a general placement order vests SSA with the minor's custody and the discretion to select suitable placement, the agency may, without further court order, react to changed circumstances by removing the child from an environment it deems no longer suitable and selecting another placement. We expressly do not decide issues implicating the relatives' status as potential adoptive parents; such issues were not preserved for appeal. (See fn. 12, *post.*)

I

This case comes before us via an extremely convoluted route, with alternating turns of elation and disappointment, joy and despair—a rocky road leading ultimately to a child's separation from the only adult caretakers she had known since birth. We recount the factual and procedural history at some length.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

Cynthia was born January 30, 1991. Due to her parents' substance abuse and utter unreliability, she was rarely in their company and far more frequently in the care of her father's brother, William C., and his wife, Sharon. She became a permanent resident of their home at 10 months of age.

SSA filed a dependency petition on Cynthia's behalf on March 2, 1992, alleging the father's incarceration and both parents' drug and alcohol abuse. At the detention hearing, SSA approved of the minor's placement with William and Sharon. In July, Cynthia was declared a dependent. SSA was vested with custody of the minor for suitable placement. The court ordered a reunification plan for the parents and granted William and Sharon de facto parent status.

Cynthia's mother and father failed to complete any aspect of their service plan. At the 12-month review hearing on July 13, 1993, the court terminated their reunification services and scheduled a permanency hearing under section 366.26. SSA, concluding adoption was probable, recommended assessment of William and Sharon as an adoptive resource.

Unfortunately, about the same time, disturbing information surfaced. There were child abuse registry reports (CAR's) alleging physical abuse of the couple's four minor sons, who shared the family residence.[2] Additionally, William, unemployed and receiving disability income as a result of a back injury, was involved in protracted litigation which the social worker perceived as "undermin[ing] the stability of the family and lead[ing] to family tensions."

Therefore, in November, SSA, expressing second thoughts, noted "family issues . . . preclude recommending [Cynthia's] adoption" by William and Sharon. But recognizing the "close bond" and the aunt and uncle's "unwavering" commitment to their niece, the agency again recommended long-term foster care, to provide the couple "sufficient time to satisfactorily resolve their interpersonal family problems." William and Sharon had already begun counseling; they agreed with the plan, "participating willingly and without resistance," hoping they would soon be reconsidered as adoptive parents. SSA believed there was an excellent prospect for that eventual outcome. At the November 10 section 366.26 hearing, the parties stipulated to the court's findings that return of the minor to the parents would create a substantial risk of detriment to her well-being, subdivision (c)(1)(D) of the

---

[2]One CAR stated Billy, Jr., then 13 years old, suffered dehydration due to his parents' neglect; another said William had struck Billy, Jr., after the minor came home late, causing him to fall and hit his eye on the kitchen sink; the third reported physical abuse of all four boys. The latter CAR was unsubstantiated; William and Sharon claimed the party responsible was a relative seeking "revenge" for some unspecified wrong.

statute applied,[3] continued supervision was necessary and long-term foster care was appropriate. Cynthia's custody remained vested with SSA for suitable placement.

By April 1994, things were going well with the aunt and uncle and SSA again recommended the couple be assessed as an adoptive home for Cynthia. But the rosy glow was short-lived. By June, William and Sharon had discontinued their counseling due to more problems, and their therapist opined she had "not seen [them] long enough in couples counseling to fully assess their ability to continue to provide the kind of stability required of prospective adoptive parents." SSA recommended, and the parties stipulated to the court's finding, long-term foster care remained the proper plan.

November brought some improvement. William and Sharon had begun "consistent" participation in counseling to enhance their marital stability. There had been no "notable incidents of concern" within the family for some time, and "the problems that led to the original referral for counseling appear[ed] to have stabilized considerably." The therapist now opined Cynthia would benefit greatly from the relatives' adoption of her. SSA, giving William and Sharon credit for their continuing struggle to overcome the problems which had delayed the adoption process, once more recommended adoption as the permanent plan, including consideration of William and Sharon as potential adoptive parents. The court agreed and scheduled another hearing under section 366.26.

In April 1995, in a supplemental court report for the permanency hearing, SSA reported that a psychological evaluation for adoptive assessment purposes had not yet been completed, but anticipated the results would be positive. It stated, "There is no doubt that [William and Sharon] will raise this minor with a great deal of love and concern." It found "no [apparent] reason why [the couple would] not receive an approved home study enabling the adoption of the minor." Nonetheless, the agency expressed certain reservations, noting, "There has been a significant amount of difficulty in getting [William and Sharon] to complete the home study. There are still several documents outstanding and the home study has not yet been approved. [The couple] den[ies] any ambivalence about adopting, reporting instead that there have been many outside stresses in their family that have

---

[3]Section 366.26, subdivision (c)(1)(D) permits the court to find termination of parental rights otherwise permissible will be detrimental to a minor if he or she "is living with a relative . . . who is unable or unwilling to adopt the minor because of exceptional circumstances, which do not include an unwillingness to accept legal or financial responsibility for the minor, but who is willing and capable of providing the minor with a stable and permanent environment and the removal of the minor from the physical custody of his or her relative . . . would be detrimental to the emotional well-being of the minor."

interfered with the completion of the home study in a timely manner." The social worker further expressed concerns about the "overall marital stability," suggesting the couple might be remaining together because of their four sons and Cynthia. Based on some background data, she was also worried about William's possible alcohol abuse.

Nonetheless, SSA recommended terminating Cynthia's parents' rights, freeing the minor for adoption and referring her for adoptive placement. Accordingly, on April 5, 1995, the court made the requisite findings and entered orders terminating parental rights, selecting adoption as the minor's permanent plan, and approving SSA's continued discretion to place Cynthia with her relatives or "any other adult deemed appropriate."

In September's periodic review, SSA reported William and Sharon were in the process of adopting the minor. On December 8, the couple petitioned for adoption.[4]

Once again, matters took a turn for the worse. In January 1996, Billy, Jr., reported to the police that his father had punched him in the face and held him down while his older brother, Nicholas, repeatedly hit him. SSA, substantiating the report, noted Cynthia witnessed the incident, which frightened her. Further investigation revealed Billy, Jr.'s nonattendance at school due to a local gang's "contract" on him and one of his friends. In addition, William and Sharon reported their two younger sons were exhibiting "extremely oppositional" behavior. The social worker, believing the family's dysfunction was far more serious than previously known, opined it would not be in the minor's best interests to remain with her aunt and uncle.

Cynthia was removed from the residence on February 2, 1996. William and Sharon agreed with SSA's approval of placement with another aunt and uncle. But Cynthia's stay at that home was brief: The relatives did not comply with procedures to become licensed foster care providers.[5] On February 18, the minor was placed in a foster home. William and Sharon were given eight hours unmonitored visitation weekly.

In March, Sharon submitted to the court an 18-page, handwritten letter, explaining the circumstances of the precipitating incident, describing the

---

[4]At Sharon's request, we take judicial notice of the adoption petition and other papers contained in court records. (Evid. Code, § 452, subd. (d)(1).) However, we do not judicially notice the truth of the matters alleged therein. (See, e.g., *Williams* v. *Wraxall* (1995) 33 Cal.App.4th 120, 130, fn. 7 [39 Cal.Rptr.2d 658].)

[5]Without much ado, we reject Sharon's contention SSA erred when it removed Cynthia from the home of the second set of relatives because they did not have a license. No one challenged the decision at the time. Assuming Sharon ever had any right to complain, she waived it. (See *In re Daniel D.* (1994) 24 Cal.App.4th 1823, 1831 [30 Cal.Rptr.2d 245], and a plethora of like cases [in general, a party is precluded from urging on appeal a point not raised in the trial court].)

boys' remorse and guilt at having caused the minor's removal, and pleading for Cynthia's return. At the March 8 periodic review hearing, the court appointed counsel for the couple. In April, as de facto parents, they petitioned this court for a writ, challenging SSA's removal of the minor without a supplemental petition under section 387. They also sought a stay of juvenile court proceedings pending determination of the writ, arguing a hearing scheduled for April 19 regarding placement issues might result in their loss of any opportunity to adopt Cynthia. We denied the petition by order filed April 16, 1996 (*William C.* v. *Superior Court,* G019553 [nonpub. opn.]), noting there was an inadequate record presented for review and in any event the petition, filed more than 60 days from the removal, appeared to be untimely.

William and Sharon did not file another petition for writ. Rather, on April 19, 1996, they petitioned the juvenile court under section 388 for modification of its April 5 and September 21, 1995, orders authorizing SSA to determine Cynthia's placement. They requested an ordered placement with them.

The section 388 hearing was repeatedly continued or trailed. In the interim, the court ordered a comprehensive psychological evaluation of William and Sharon and their children. (Evid. Code, § 730.) Les Widerynski, Ph.D., was directed, inter alia, to assess the couple's ability to benefit from therapy and the likelihood of their physical abuse of Cynthia upon her reaching adolescence. Widerynski was to give his opinion "whether the minor . . . should be adopted by [the relatives]" and whether "they require intervention in the form of therapy or parenting for successful placement to occur."

After completing his evaluation, the psychologist commented on several areas of family dysfunction and recommended implementation of four programs, including family therapy sessions, to gain a better understanding of the chain of events leading to family disruption, and individual counseling for William, Sharon and Billy, Jr., to address issues specific to each one. He was concerned the aunt and uncle might not be able "to provide a setting in which a child would be protected from not only severe forms of discipline, but, also the emotional trauma which might occur in a home where such discipline or physical violence is observed." On the other hand, he noted there could be serious psychological consequences if Cynthia were permanently removed. He did not want the minor returned to William and Sharon until some progress was made. He suggested gradually increased visitation privileges, with the caveat that if another incident occurred, the couple should not be considered as an adoptive placement.

The section 388 matter was scheduled to be heard with a progress review on August 22. The parties' written stipulation presented at that hearing is

ambiguous: The court itself noted it had "received a stipulation form, but that's a form only. It's not a true stipulation since there will be a hearing on the record." The reporter's transcript clearly indicates, however, the parties stipulated to continue the section 388 matter to another date and proceed with the contested periodic review. After receiving SSA's reports and the psychological evaluation, the court found adoption continued to be the appropriate plan and ordered Cynthia to remain in her foster care placement, with the relatives' visitation to be increased to two 8-hour visits per week, and to be further increased when William and Sharon showed compliance with Widerynski's recommendations. The court noted it would reassess the section 388 motion on October 7, anticipating return of the child might be possible at that time.

Unfortunately, another bump in the road was encountered en route to the next hearing. At the end of September, William and Sharon separated, announcing their intention to dissolve the marriage. William moved out with one son (Michael); Nicholas, at age 18, apparently was on his own; and David and Billy, Jr., remained with Sharon, who was unemployed, receiving no financial support from William, and in the process of applying for public assistance. Due to a conflict in representation, the couple's attorney was relieved. At the court's suggestion, Sharon's new counsel withdrew the section 388 petition due to the family's drastically altered circumstances, without prejudice to filing a new petition.

The next untoward development is reflected in an SSA report for the November 5 hearing: Cynthia returned to her foster home from a visit with her aunt and cousins, holding her "private area" and complaining about pain in her side; she also had decreased appetite. Questioned by her foster mother, she said her "brother" David and a neighbor boy had "touched her privates." In a subsequent interview with the social worker, the minor stated the boys forced her into David's bedroom, where they both touched her "privates" over her underwear and David showed her his "wiener." She further reported Nicholas, left alone with her to babysit, touched her "privates" with his "wiener." SSA recommended restricting visitation to one monitored hour per week and prohibiting David and Nicholas from any contact, noting, "[Sharon] failed to protect the minor in the past and is unwilling to believe the minor's statement."

On December 3, Sharon filed a new section 388 petition, seeking immediate custody or, in the alternative, a bonding study. The petition alleged the minor had been removed from the home solely because of William's physical abuse of Billy, Jr. Now that Sharon and William were "permanently separated," the reason for the removal no longer existed. Sharon contended

because of the strong bond she shared with Cynthia, it was detrimental to the minor to be placed anywhere but with her.

At the December 13 hearing, Sharon testified she wanted a service plan designed to help her get Cynthia back. She said she had been attending family counseling with William and three of the sons until the previous September 26, but had not engaged in the individual counseling required under Widerynski's recommendations because she was in the process of "moving to a different county." She disagreed with Widerynski's opinion she suffered from depression and anxiety; nonetheless, she said she was willing to begin participating in the recommended counseling in the future if that was what she had to do to obtain the minor's return.

Sharon, David and Billy, Jr., were staying with Sharon's sister and brother-in-law and their five children. Sharon was not ready for Cynthia's return until she could "get into [her] own house," which she expected to do "probably sometime in January." The court observed "that creates a problem" because it was required to rule on the state of the evidence then before it. Upon renewed questioning, Sharon testified it would be possible for Cynthia to live with her right away in the sister's home, although she acknowledged her two sons already had to sleep in the living room.

Sharon had seen the minor 13 times over the previous 3-month period. When she picked up Cynthia or dropped her off, she was sometimes accompanied by David or Nicholas, but she never allowed either of the boys to be alone with the minor. She did not believe the child's molestation disclosure; she said Cynthia was in her care at the time of the alleged sexual abuse and had not been alone with the boys. She was not concerned about Cynthia being alone with her sister's sons, but agreed it might be a good idea not to leave her alone with David or Nicholas under the circumstances.

After considering Sharon's testimony and various SSA reports, the court determined a bonding study would not be helpful because "that's always been assumed since the child was removed from the home . . . the child . . . was very attached and probably remains attached to [William and Sharon]." In fact, the court observed, it was the obvious attachment which had prompted it to order the broad-scope psychological evaluation of William and Sharon and their sons.

The court then turned to "the real issue" of whether the child should be returned to Sharon that day and whether Sharon was entitled to "any sort of plan or reunification" to facilitate the return. It found the de facto parent had no such entitlement; further, it found Cynthia would suffer detriment if

returned to Sharon's care because Sharon herself admitted her life was "somewhat chaotic at this point." She was without permanent or stable housing, residing in "a crowded living situation" which, with the minor's return would be more crowded. She was not working and had no source of income; she had no evidence there would be sufficient funds to meet the family's needs if the minor were returned. The court perceived Sharon had not yet "come to terms with a lot of problems within [her] family, and a lot of problems that related to issues apart from why [William] left." It added, "I really do not believe that [Cynthia] could be adequately protected or cared for in [Sharon's] custody." Denying the section 388 petition, it found Sharon failed to carry her burden of proving modification would be in Cynthia's best interests. SSA was directed to continue looking for an adoptive home.

## II

Sharon contends SSA had to file a section 387 supplemental petition and obtain a hearing before removing Cynthia from her home. SSA argues the appeal of the removal, coming more than one year after the incident, must be dismissed as untimely. In the alternative, SSA and the minor assert that Sharon's stipulation to the appropriateness of the minor's placement after her removal, and her withdrawing of the first section 388 petition, constitute a waiver of any challenge now. We reject the technical defenses.

■ First, the appeal is not untimely. In juvenile dependency cases, an appeal must be filed within 60 days of the challenged judgment or order. (Cal. Rules of Court, rule 39(b).)[6] "[A]ppellate jurisdiction is dependent upon the filing of a timely notice of appeal. [Citations.] 'An appeal from the most recent order entered in a dependency matter may not challenge prior orders, for which the statutory time for filing an appeal has passed.' [Citations.]" (*In re Megan B.* (1991) 235 Cal.App.3d 942, 950 [1 Cal.Rptr.2d 177].) Here, the child was removed from William and Sharon's home *without* a court order. Because no order triggered the 60 days, there is no beginning point from which to calculate the end of jurisdiction. Dismissal would be improper.[7]

With regard to the waiver issue, we have rarely seen a record as convoluted and at times confusing as this. One thing is clear, however: From the moment Cynthia was removed, Sharon pleaded for relief. Inter alia, she delivered a poignant handwritten note to the court. She then filed a petition

---

[6]All rule references are to the California Rules of Court.

[7]In light of this conclusion, we need not reach the merits of the parties' various additional arguments about other things Sharon could or should have done at the time of the challenged removal to obtain an appealable order.

for writ in this court which failed not on the merits, but due to technical inadequacies. Obtaining no appellate relief, she petitioned the juvenile court under section 388. Before the matter could be heard, the marriage collapsed and the petition obviously had to be withdrawn. SSA and the minor hang their waiver hat on a stipulation which is *not* unconditional as to Sharon's acquiescence in the propriety of the removal or the foster care placement. We are unconvinced.

## III

We turn to the merits. Sharon argues SSA had to file a supplemental petition under section 387 before removing the child from her home. SSA and the minor maintain section 387 is inapplicable when the previous order vests custody with the agency for suitable placement. In such a case, they explain, section 388 controls, with the burden on the party seeking a change. We agree.

Section 387 states, "An order *changing or modifying a previous order* by removing a minor from the physical custody of a parent, guardian, relative, or friend and directing placement in a foster home, or commitment to a private or county institution, shall be made only after noticed hearing upon a supplemental petition." (Italics added.) Subdivision (a) of the statute directs the agency to set forth "a concise statement of facts sufficient to support the conclusion that the *previous disposition* has not been effective in the . . . protection of the minor." (Italics added.) The statute umambiguously governs situations involving an *ordered* placement which the agency later considers ineffective.

This interpretation is bolstered by rule 1430, which identifies different procedures for changing, modifying or setting aside orders made by the court, depending upon the particular circumstances. Rule 1430(b)(2) provides for a *subsequent* petition if, "[a]t or after the disposition hearing the court *has ordered that a parent or guardian retain custody of the dependent child* and the petitioner receives information providing reasonable cause to believe the child is now, or once again, described by section 300(a), (d), or (e)." (Italics added.) Rule 1430(c)(1) requires a *supplemental* petition when SSA concludes a *previous disposition* has been ineffective "and seeks a more restrictive level of custody," according to a specific schedule. Neither rule was implicated here.[8]

---

[8]Clearly, the applicable procedure is set forth in rule 1430(e), which mandates the filing of a modification petition under section 388 "if there is a change of circumstances or new

The court did not make an ordered placement with Sharon. Instead, its order vested custody with SSA to select a suitable placement. That order never changed throughout the proceedings. SSA was *always* authorized to exercise its discretion to reassess the suitability of the environment in which it had placed the child and, if deemed unsuitable, move the minor to an improved situation. (See *Department of Social Services* v. *Superior Court* (1997) 58 Cal.App.4th 721 [68 Cal.Rptr.2d 239] [social services agency has sole authority to determine appropriate interim placement of minor pending adoption, subject only to judicial review for abuse of discretion].)[9] Nor did the mere passage of time transform the general placement order into some sort of de facto order giving Sharon a right to custody or continued placement.

SSA became aware of an incident of physical violence involving William and Billy, Jr. It learned Cynthia had witnessed the incident and was frightened. It further learned Billy, Jr., was not attending school because of a gang's threats, raising additional concerns about the safety of the home. Finally, William and Sharon themselves reported "extremely oppositional" behavior by their two younger sons. The social worker, finding far more serious family dysfunction than previously realized, decided the placement was unstable and potentially dangerous. SSA had no duty to file a section 387 petition and obtain a court order for Cynthia's removal to a licensed foster care home it deemed safer and more suitable. The matter was within its sound discretion. (See *Department of Social Services* v. *Superior Court, supra*, 58 Cal.App.4th 721.)[10]

Moreover, Sharon's status as a de facto parent does not give her a right to the minor's continued placement with her. Rule 1412(e) entitles a de facto parent to participate as an interested party in the dispositional and

evidence that may require the court to: [¶] (1) Change, modify, or set aside an order previously made; or [¶] Terminate the jurisdiction of the court over the child." Sharon, in fact, properly utilized the procedure to seek relief from the court's prior orders vesting custody and placement discretion in SSA.

[9]Sharon mistakenly relies on *In re Joel H.* (1993) 19 Cal.App.4th 1185 [23 Cal.Rptr.2d 878] to demonstrate SSA was required to file a supplemental petition here. *Joel H.* is inapt; it involved an ordered placement with the maternal great-aunt and her husband.

[10]Apart from the issue of SSA's removal without a supplemental petition, Sharon raises no question regarding the agency's abuse of discretion. Nor does she contend the court improperly delegated discretionary authority to SSA. Indeed, such an argument would be futile. (See *Department of Social Services* v. *Superior Court, supra*, 58 Cal.App.4th at pp. 733-734.)

Because we determine there is no need for a supplemental petition under these circumstances, we necessarily reject Sharon's assertion SSA could not remove the child without first proving by clear and convincing evidence the existence of substantial danger to the minor's physical health, under section 361, subdivision (b). The statute is inapplicable, as is the case upon which Sharon relies, *In re Paul E.* (1995) 39 Cal.App.4th 996 [46 Cal.Rptr.2d 289].

subsequent hearings: "The de facto parent may: [¶] (1) Be present at the hearing; [¶] (2) Be represented by retained counsel or . . . appointed counsel; [¶] [and] (3) Present evidence." Sharon fully exercised her rights as a de facto parent. She participated in all of the proceedings, testifying in her own behalf as to her interest in the companionship, care, custody and management of the child; she had an opportunity to call her own witnesses and to cross-examine SSA's witnesses. (See, e.g., *In re Kieshia E.* (1993) 6 Cal.4th 68, 77, fn. 7 [23 Cal.Rptr.2d 775, 859 P.2d 1290].) She was not entitled to any additional protection regarding the minor's continued placement in her home.[11]

Sharon also asserts removal without notice and a hearing violated her statutory rights under Family Code section 8704, subdivision (b), and her due process rights under the federal Constitution. We decline to reach these issues: She waived them by failing to raise them at any time in the juvenile court or, for that matter, even when she petitioned the appellate court for relief. (See fn. 5, *ante*.)[12]

---

[11]*In re Kieshia E., supra*, 6 Cal.4th 68, also disposes of Sharon's argument she was entitled to reunification services. It states, "De facto parents are *not* entitled to reunification services and cannot be required to participate in such services. [Citation.]" (*Id.* at p. 77, fn. 7, italics added.) As our Supreme Court observed, "[E]ven those who attain the status of de facto parenthood 'are not equated with . . . parents or guardians for purposes of dependency proceedings and standing to participate does not give them all of the rights and preferences accorded [parents or guardians]. [Citations.]. . . .' [Citations.]" (*Id.* at p. 77.)

Sharon protests she was uniquely related to Cynthia as a "psychological mother with whom the child had lived for five years." For that reason, she claims, she "should have been entitled to reunification services." We find no legal thread in the fabric of the argument. By definition, a de facto parent is "a nonparent who has undertaken the parental role on a day-to-day basis, 'seeking to fulfill both the child's physical needs and his [or her] *psychological need for affection and care*' . . . . [Citation.]" (*In re Kieshia E., supra*, 6 Cal.4th at p. 75, italics added.) Sharon cannot show she comes within some sort of special category entitling her to rights superior to those of all other de facto parents.

[12]In *In re Joseph E.* (1981) 124 Cal.App.3d 653 [177 Cal.Rptr. 546], the parents appealed from an order terminating their parental rights. The father urged reversal based upon a lack of notice of the initial dependency proceedings years earlier. Declining to reach the merits, the reviewing court observed, "[T]he claimed deficiency was not pointed out or relied upon in the superior court, and appears to be raised for the first time on this appeal." (*Id.* at p. 657.)

Here, Sharon was appointed counsel in the dependency proceedings approximately one month after Cynthia was removed from her care. She then challenged the removal by petition for writ, without raising either the facts or the law upon which she now relies to defeat jurisdiction. Subsequently, she filed a section 388 petition, then withdrew it due to the collapse of the marriage. Then she filed another section 388 petition, seeking not to *invalidate* the SSA's discretionary placement authority, but to *change* prior orders regarding that authority and obtain, instead, an ordered placement. And she had a full hearing on the merits of her modification petition. Never once did she claim inadequate notice or object to violation of her rights under Family Code section 8704.

IV-VI*

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

The orders are affirmed.

Sills, P. J., and Bedsworth, J., concurred.

A petition for a rehearing was denied November 17, 1997, and appellant's petition for review by the Supreme Court was denied February 3, 1998.

---

*See footnote, *ante*, page 1479.