Filed 5/31/13  In re Amara O. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re AMARA O., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>MARIA O.,<br><br>        Defendant and Appellant. | D063297<br><br>(Super. Ct. No. SJ12816) |

        APPEAL from a judgment of the Superior Court of San Diego County, Garry G.

Haehnle, Judge.  Affirmed.


        Christopher R. Booth, under appointment by the Court of Appeal, for Defendant

and Appellant.

        Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County

Counsel and Dana C. Shoffner, Deputy County Counsel, for Plaintiff and Respondent.

Maria O. appeals following the jurisdictional and dispositional hearing in the dependency case of her daughter, Amara O.  Maria raises three contentions:  substantial evidence does not support the jurisdictional finding; the juvenile court erred by ordering Amara removed from her custody; and the dependency petition was so vague as to violate Maria's procedural due process rights.  We affirm.

BACKGROUND

In November 2011, Maria alleged that six-year-old Amara's former teacher, Mr. L., had been molesting Amara for a month.  Maria made video recordings in which she relentlessly asked Amara leading questions for an hour and Amara agreed with the information Maria provided.  After an investigation, including a physical examination and forensic interview of Amara, and laboratory tests on her underwear, the allegations were determined to be unfounded.

During the forensic interview, Amara made various odd statements.[1]  The interviewer recommended that Amara attend therapy and gave Maria referrals.  In December 2011, Amara began therapy with Carmen De Llano, Ph.D.

Maria continued to believe that Mr. L. had molested Amara.  Although Mr. L. had no contact with Amara or Maria, Maria left numerous voice mails for a police detective making rambling allegations against Mr. L.  Maria claimed Amara was being taken to Mr. L.'s home where she was sexually abused.  Maria stated she heard voices saying

---

[1]     For example, Amara, an only child, said she had a brother and a sister.

2

people were plotting against her and Amara. Maria sent the detective 30 pairs of Amara's underwear which she claimed contained blood, lotion and pubic hairs. Although the police detective and Dr. De Llano had told Maria not to discuss her accusations with Amara, Maria continued making recordings of Amara to prove she had been abused. A social worker from the San Diego County Health and Human Services Agency (the Agency) told Maria she was placing Amara at risk of emotional abuse. The social worker asked Maria to sign a safety plan and to cease speaking of the allegations to Amara except in a therapeutic setting. Maria refused to sign the plan but requested a copy so she could follow the Agency's advice.

Over the next several months, Maria made more detailed allegations. She claimed Amara married Mr. L.; she was taken from school and to Mexico; and she was "pimped," raped and subjected to anal sex and bondage. Maria said her neighbors were involved in these events. In May 2012, Maria gave the detective audio recordings she said she had made of Amara. The recordings contained nothing but static and background noise. Later recordings Maria provided contained her own commentary and sounds of Amara splashing in the bath and screaming. In one recording, Amara could be heard hitting something, and Maria could be heard telling her to stop; then the sound of three slaps, after which Amara screamed and cried as if she had been spanked.

In July 2012, Maria called the detective. She reported that in May, Mr. L. had snuck into her house and choked Amara, then escaped with the help of neighborhood children. Maria claimed to have a recording of these events, including neighbors "egging [Mr. L.] on" and voices saying, "She needs to be dead today." Police officers went to

3

Maria's home. The officers listened to the recordings but heard nothing. Maria was behaving strangely and sweating profusely, and her heart rate was elevated. She claimed to hear neighborhood children singing threats and people saying something about her car. A social worker interviewed Amara, who denied any abuse.

During one home visit, a social worker observed Amara playing roughly with a pet mouse. At a subsequent visit, the social worker asked about the mouse. Maria said Amara had played too roughly with the mouse and accidently killed it. Amara went into another room with her new pet kitten, and could be heard yelling and screaming and banging around. When the social worker asked about the noise, Maria said Amara chased the cat when she was upset.

In August and September 2012, Maria said people were sneaking into her house, and her neighbors were harassing and threatening her. She forbade Amara to play in the backyard, believing the neighbors were friends of Mr. L. Maria kept Amara out of school for fear Mr. L. would take her. Dr. De Llano reported Amara was erratic and destructive and needed therapy, but Maria was not bringing her to appointments regularly. Dr. De Llano believed Maria was suffering from psychotic episodes with auditory hallucinations and needed therapy. In September, Dr. De Llano terminated Amara's therapy due to numerous missed sessions. In October, Maria called the detective and said Mr. L. and others were screaming outside her house that she and Amara were going to die in a fire.

On October 9, the Agency filed a dependency petition. The petition alleged Amara had suffered, or there was a substantial risk she would suffer, serious physical

4

harm or illness as a result of Maria's mental illness, which rendered Maria incapable of providing regular care for Amara. (Welf. & Inst. Code, § 300, subd. (b).)[2] On October 10, 2012, the Agency took Amara into protective custody and detained her in a foster home.

The petition alleged Maria appeared to suffer from psychotic episodes with auditory hallucinations. She heard voices. She asserted that Amara had been sexually abused by Mr. L. On several occasions, Maria subjected Amara to lengthy interrogations concerning the abuse and recorded the interrogations. Maria gave audio recordings to the police, but the recordings were blank. She gave the police 30 pairs of Amara's underwear, claiming they contained blood, lotion and pubic hair. Maria was told Amara needed therapy, but failed to take Amara to therapy consistently. Maria continued to interrogate Amara and her accusations of sexual abuse appeared to have escalated. Maria had begun to isolate Amara.

After the petition was filed, Maria persisted in her belief that Mr. L. had molested Amara and the neighborhood children had participated. Maria insisted she was justified in keeping Amara out of school. The foster mother reported that Amara exhibited aggressive behavior and irritable moods; screamed loudly and persistently when upset; refused to do homework; and had difficulty staying still. Amara was not allowed to play with the family's hamster because she was rough. Amara attempted to hit and scratch a toddler in the foster home.

---

[2]      All further statutory references are to the Welfare and Institutions Code.

Before a visit scheduled for October 16, 2012, Amara hid under her bed and said she did not want to visit because Maria "had told her she was coming to take her away." Maria cancelled the visit, saying she was ill. The first visit took place on October 23 and went well. After the visit, however, Amara refused to complete her homework, screamed, threw toys and clothing Maria had given her and refused to go to school. For the next several days, Amara refused to speak with Maria on the telephone.

In December 2012, the court made a true finding on the petition and ordered Amara removed from Maria's custody.

## THE JURISDICTIONAL FINDING

The purpose of section 300 "is to provide maximum safety and protection for children who are currently being physically . . . or emotionally abused [or] neglected . . . , and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (§ 300.2.) Section 300, subdivision (b) allows a dependency when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the . . . inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness . . . ." Section 300 requires proof the child is subject to the defined risk of harm at the time of the jurisdictional hearing. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1396.) A parent's " '[p]ast conduct may be probative of current conditions' if there is reason to believe that the conduct will continue." (*In re S.O.* (2002) 103 Cal.App.4th 453, 461.) The child need not have been actually harmed for the court to assume jurisdiction. (See *In re James R.* (2009) 176 Cal.App.4th 129, 135.)

6

In the juvenile court, the Agency had the burden of proof by a preponderance of the evidence. (*In re Matthew S.* (1996) 41 Cal.App.4th 1311, 1318 (*Matthew S.*); § 355, subd. (a).) Maria now has the burden of showing the jurisdictional finding is unsupported by substantial evidence. (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1135.) We view the record in the light most favorable to the court's ruling. (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1140.)

Maria contends there is not substantial evidence Amara suffered or was at substantial risk of suffering serious physical harm or illness or that Maria caused Amara serious physical harm. We conclude substantial evidence supports the jurisdictional findings.

For nearly a year, Maria made increasingly bizarre allegations regarding Amara's victimization by Mr. L. Maria expanded her allegations to include neighbors and children in imagined plots against Maria and Amara. Maria was so focused on her investigation of those plots that she ignored Amara's problems and needs. Maria isolated Amara, keeping her in the house and out of school and depriving her of the therapy she desperately needed.[3] Maria showed no concern about Amara's violent behavior, including roughness so extreme it lead to the death of a pet mouse. Maria's involvement of Amara in Maria's attempts to prove Amara had been sexually abused increased the possibility the truth would never be discovered. (*In re H.E.* (2008) 169 Cal.App.4th 710,

---

[3] Although Maria and Amara lived with the maternal grandparents, the grandmother had no concerns about Maria's mental health or care of Amara. There is no information in the record about the maternal grandfather, aside from the fact that he was disabled and confined to a wheelchair.

724.) Maria believed she and Amara had been threatened with death several times, and the detective believed Maria's delusions and paranoia might worsen "to the point where she feels the only way to protect herself and [Amara] would be to end their lives." Amara was unable to protect herself, and without the court's involvement, she would have been subject to Maria's unpredictable behavior and increasing delusions, which posed a grave risk to Amara's physical safety.

Maria cites *Matthew S.* There, the mother suffered from delusions, including that 13-year-old Matthew's penis was mutilated and she had murdered his treating physician. (*Matthew S., supra,* 41 Cal.App.4th at p. 1314.) Acting on the delusions, the mother took Matthew to a urologist, who found no evidence of injury. (*Ibid.*) The reviewing court reversed the juvenile court's section 300, subdivision (b) true finding. (*Id.* at pp. 1318-1319.)

*Matthew S.* is distinguishable from the instant case. Matthew was a well-adjusted teenager (*Matthew S., supra,* 41 Cal.App.4th at p. 1316), not a troubled six-year-old. He was doing well in school and wanted to live with the mother. (*Ibid.*) He expressed no fear of her, recognized her delusions and was able to deal with them adequately. (*Id.* at pp. 1316-1317.) The mother recognized she might be delusional (*id.* at p. 1316) and admitted she needed help with her psychiatric problems (*id.* at p. 1314). She had participated in extensive therapy, and agreed she should not parent Matthew if she presented a danger to him. (*Id.* at p. 1316.) She did not discuss her delusions with him after he was returned to her care. (*Ibid.*) The urologist did not believe Matthew was in danger of mistreatment. (*Id.* at p. 1314.) The social worker did not think the mother

8

would be violent in the near future, and "saw evidence that the mother's 'peculiar beliefs are starting to crumble.' " (*Id.* at pp. 1315-1316.)

## THE REMOVAL

Before a child can be removed from parental custody, the Agency must prove, by clear and convincing evidence, "[t]here is or would be a substantial danger to [her] physical health, safety, protection, or physical or emotional well-being if [she] were returned home" and removal is the only reasonable means of protecting her physical health. (§ 361, subd. (c)(1).) "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus . . . is on averting harm to the child." (*In re Diamond H.*, *supra*, 82 Cal.App.4th at p. 1136.) " '[P]ast conduct may be probative of current conditions' if there is reason to believe that the conduct will continue." (*In re S.O.*, *supra*, 103 Cal.App.4th at p. 461.) The court is entitled to consider a parent's past conduct and current situation and gauge whether she has progressed sufficiently to eliminate any risk. (*Ibid.*; cf. *In re Jonathan R.* (1989) 211 Cal.App.3d 1214, 1221.)

On appeal, Maria has the burden of showing there is no substantial evidence justifying Amara's removal. (*In re Diamond H., supra,* 82 Cal.App.4th at p. 1135.) Maria argues because the jurisdictional finding was improper, the removal order must be reversed. She also argues there was "no significant new evidence at disposition to suggest harm, or risk of harm, to Amara."

As discussed above, substantial evidence supports the jurisdictional finding. Maria isolated Amara, and deprived her of the therapy she needed to deal with serious

9

issues, including her violent conduct. Maria was not receiving therapy, her delusions and paranoia were growing worse and she believed she and Amara might be killed. This constitutes substantial evidence supporting the conclusion there would have been "a substantial danger to [Amara's] physical health, safety, protection, or physical or emotional well-being if [she had been] returned" to Maria and there were no reasonable means of protecting Amara's physical health short of removal. (§ 361, subd. (c)(1).)

As we have made clear in this opinion, there is abundant substantial evidence in this record to support both the jurisdictional findings and dispositional judgment in this case. Because the record clearly presents evidence of a clear and present risk of harm to Amara, we find this to be a meritless appeal.

## PROCEDURAL DUE PROCESS

Maria contends "the Agency did not, in the dependency petition or anywhere else, articulate absolutely any serious physical harm, or risk thereof"; thus, she "had no notice or meaningful ability to defend against the allegations, and was thereby deprived of due process."[4] We reject this contention. The petition alleged Amara was at substantial risk of serious physical harm or illness, and the facts set forth in the petition supported the allegation.

---

4    Contrary to the Agency's contention, Maria raised the issue in the juvenile court. Her trial attorney asked the court to "dismiss the petition as it doesn't describe a child under . . . section 300[, subdivision] (b)."

10

DISPOSITION

The judgment is affirmed.


                                                    HUFFMAN, Acting P. J.

WE CONCUR:


HALLER, J.


McINTYRE, J.