Filed 6/24/13  In re Matthew G. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re MATTHEW G., a Person Coming Under the Juvenile Court Law. | D063140 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. SJ12739) |
| v. | |
| JOHN M., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Garry G. Haehnle, Judge.  Affirmed.

Donna Balderston Kaiser, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel and Paula J. Roach, Deputy County Counsel, for Plaintiff and Respondent.

At the six-month review hearing in the juvenile dependency case of Matthew G., the juvenile court granted the modification petition of the San Diego County Health and Human Services Agency (the Agency) (Welf. & Inst. Code, § 388, subd. (c)(3))[1] and terminated reunification services for Matthew's father, John M. John appeals, contending he was deprived of procedural due process because the petition did not allege that continued services would be detrimental to Matthew. John also contends the evidence is insufficient to support the detriment finding; the finding that he was provided reasonable services; and the finding that his action or inaction created a substantial likelihood reunification would not occur. We affirm.

BACKGROUND

John began using marijuana in 1999 or 2000, when he was 15 years old. Matthew was born in July 2005 to L.G., and although John was aware of the pregnancy, he did not take an interest in Matthew until 2011.

As of 2009 or 2010, John was on probation or parole[2] for a domestic violence conviction. He was also subject to a criminal protective order obtained by the domestic violence victim, his former girlfriend. The protective order was set to expire April 21, 2013. After 2009, John had no contact with his two children from that relationship. John

---

[1]    Further statutory references are to the Welfare and Institutions Code.

[2]    Various parts of the record are in conflict on this point.

claimed he was wrongfully convicted and he was the victim of the domestic violence. He completed a 52-week domestic violence course in December 2011.

In 2011, John began smoking marijuana for pain management. In November, he began living with L.G. and Matthew. In January 2012, John attempted to spank Matthew with a ruler. A metal strip on the ruler struck Matthew's fingers and caused them to bleed. Matthew said that John hit him "hard" and "he was afraid that [John] was going to rip my body off."

On the evening of March 2, 2012, Matthew vomited and fainted. L.G. and John (together the parents) took Matthew to the emergency room. John left the hospital and L.G. stayed with Matthew. L.G. reported that John had smoked marijuana in the car that afternoon, while Matthew was in the car. At the hospital, Matthew was unconscious for six hours and tested positive for marijuana.

In interviews with social workers, Matthew described John's marijuana use and violence. Matthew said, "[John] told me that [the social worker] was going to take me away and I was sad and I cried a lot." John denied exposing Matthew to marijuana and denied any domestic violence. John said he would not have taken Matthew to the hospital if he had known that Matthew was under the influence of marijuana.

On March 6, 2012, six-year-old Matthew was detained in Polinsky Children's Center (Polinsky). On March 9, the Agency filed a dependency petition. The petition, as later amended, alleged that beginning in March, John used marijuana to excess. Matthew tested positive for marijuana twice. John admitted he used marijuana and had a medical marijuana card. The parents denied they used marijuana at home or around Matthew.

3

Matthew described how to use a marijuana pipe and where to put the marijuana. He knew how to inhale the smoke, hold it in and then exhale.

Beginning in February, Matthew was exposed to the parents' violent confrontations. In Matthew's presence, the parents had an argument that included slapping. During the argument, John destroyed some items in the house and threw Matthew's bird cage on the floor, killing the bird. Matthew and L.G. said that John threw all of their clothes out of the house and told them to leave. John had a history of domestic violence, including a 2009 altercation with the mother of Matthew's half siblings.

At the detention hearing, the court ordered liberal, separate visits for the parents, with supervisors chosen by the Agency, and ordered the Agency to give the parents referrals to voluntary services. While Matthew was at Polinsky, John had twice-weekly visits. On March 16, 2012, Matthew was moved to the home of a relative. John visited Matthew there.

On March 26, 2012, the Agency sent John referrals to a domestic violence program, individual therapy, a parenting course and substance abuse treatment. On March 29, the court made true findings on the dependency petition, ordered Matthew placed with a relative and ordered reunification services for the parents. John's reunification plan included the four services listed above and supervised visitation. On April 3, John was incarcerated on charges of burglary and inflicting corporal injury on a cohabitant. The court authorized a telephone card for John while he was incarcerated, and ordered visitation consistent with the policy of the facility.

4

In his relative placement, Matthew was hostile and uncooperative and engaged in self-destructive behavior. As a result, the relative contemplated ending the placement. The social worker enlisted the help of a therapist to stabilize the placement and, over several months, Matthew's behavior improved.

Matthew refused to visit John in jail. When asked why, Matthew replied that John had killed his bird and hurt L.G. Matthew said he was scared when John killed the bird. For several months, Matthew remained resolute in his refusal to visit John. Meanwhile, John was moved, several times, to different facilities. In August 2012, Matthew said he did not want to visit John "because it was too far." The Agency asked John to write letters or telephone Matthew as a way to increase Matthew's comfort with visitation. John did not send any letters, and his incarceration apparently precluded telephone calls.

By September 5, 2012, John had been transferred to a prison in Imperial County.[3] He told the Agency the prison would not allow him to have any visitors during his assessment immediately following his transfer. To receive approval for visits after the assessment, the prison required John to sign forms and send them to the Agency. John did so, and immediately upon receiving the forms, the Agency sent them to the relative caregiver. By September 13, the caregiver had completed the forms and sent them to the prison, and a 30-day waiting period for the prison's approval had begun. The social worker called the prison to ask for a visit during the waiting period, but received no

---

[3]    The record does not include the date of the transfer and does not show any further transfers.

5

response. Meanwhile, the social worker and Matthew's therapists encouraged Matthew to visit and, by September, Matthew had reluctantly agreed.

As of September 13, 2012, John's incarceration had prevented him from participating in any services. On October 10, the Agency filed its modification petition (§ 388, subd. (c)(1)(A) & (B)). The hearing on the petition took place at the November 14 six-month review hearing. By the time of the hearing, there had been no visits between John and Matthew in jail or prison.

At the hearing, the court received the following stipulated testimony of the social worker, presented by John's counsel: "[The social worker] received an e-mail from [John's] counsel stating that her investigator found that [John's] current facility provides substance abuse programs through [Alcoholics Anonymous (AA)] and narcotic abuse programs through [Narcotics Anonymous (NA)], anger management, creative conflict resolution, parenting classes and several religious based education programs. [¶] [John's] counsel indicated that she received this information from Ken Phillips who worked at the facility. [The social worker] tried to follow-up with Mr. Phillips . . . . [¶] . . . [¶] [The social worker] left messages, but Mr. Phillips has never responded. [The social worker] was able to reach [Rebecca Lores, the litigation coordinator in the warden's office, and Lores] stated that there were the following programs available to [John]: AA group and NA group and anger management class."

The court granted the section 388 petition and terminated John's reunification services. The court continued L.G.'s reunification services and confirmed the March 26, 2013, 12-month review hearing.

6

DISCUSSION

I

*Introduction*

"When a dependent child is removed from parental custody, the court generally orders services for the family to facilitate its reunification. [Citations.] Reunification services for a parent of a dependent child over the age of three are ordinarily limited to 12 months, but may be extended to the 18-month date. [Citation.] A parent, however, has no entitlement 'to a prescribed minimum period of services.' [Citation.] Instead, the court has discretion to determine whether continued services are in the best interests of the minor, or whether services should be terminated at some point before the applicable statutory period has expired." (*In re Katelynn Y.* (2012) 209 Cal.App.4th 871, 876.) " '[R]eunification services are a benefit, not a constitutional entitlement . . . .' " (*Id.* at p. 877, quoting *In re Jesse W.* (2007) 157 Cal.App.4th 49, 60.)

In the case of "a child who, on the date of initial removal from the physical custody of his or her parent . . . , was three years of age or older" (§ 361.5, subd. (a)(1)(A)), the Agency may petition for termination of reunification services before the 12-month review hearing (§ 366.21, subd. (f)). A petition is appropriate if "a change of circumstance or new evidence exists that satisfies a condition set forth in subdivision . . . (e) of Section 361.5" (§ 388, subd. (c)(1)(A)), or if "[t]he action or inaction of the parent . . . creates a substantial likelihood that reunification will not occur,

7

including, but not limited to, the parent's . . . failure to visit the child, or the failure of the parent . . . to participate regularly and make substantive progress in a court-ordered treatment plan" (*id*., subd. (c)(1)(B)). "The court shall terminate reunification services . . . only upon a finding by a preponderance of evidence that reasonable services have been offered or provided, and upon a finding of clear and convincing evidence that one of the conditions in subparagraph (A) or (B) of paragraph (1) exists." (*Id*., subd. (c)(3).)

Section 361.5, subdivision (e)(1), referred to in section 388, subdivision (c)(1)(A), states "the court shall order reasonable services [for an incarcerated parent] unless the court determines . . . those services would be detrimental to the child. In determining detriment, the court shall consider the age of the child, the degree of parent-child bonding, the length of the sentence, . . . the nature of the crime . . . , the degree of detriment to the child if services are not offered . . . , the likelihood of the parent's discharge from incarceration . . . within the reunification time limitations described in subdivision (a), and any other appropriate factors." (§ 361.5, subd. (e)(1).) As to section 388, subdivision (c)(1)(B), "[i]n determining whether the parent . . . has failed to visit the child or participate regularly or make progress in the treatment plan, the court shall consider factors that include, but are not limited to, the parent's . . . incarceration . . . ." (§ 388, subd. (c)(2).)

On appeal, we first determine whether the required factual findings are supported by substantial evidence. (*In re M.V.* (2006) 146 Cal.App.4th 1048, 1059-1060.) If substantial evidence supports those findings, we decide whether the juvenile court abused

8

its discretion by terminating reunification services based on the findings. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415.) " ' "The sufficiency of evidence to establish a given fact, where the law requires proof of the fact to be clear and convincing, is primarily a question for the trial court to determine, and if there is substantial evidence to support its conclusion, the determination is not open to review on appeal." [Citations.]' [Citation.] Thus, on appeal from a judgment required to be based upon clear and convincing evidence, 'the clear and convincing test disappears . . . [and] the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong.' " (*Sheila S. v. Superior Court* (2000) 84 Cal.App.4th 872, 880-881.)

Here, the Agency's petition cited section 388, subdivision (c)(1)(A) and (B) and alleged the following facts: John was incarcerated with a release date of April 5, 2013. Because his detention facility did not provide services, he would be unable to complete domestic violence and drug abuse programs by the 12-month review date. John was a part of Matthew's life for a short period before the inception of this case, and Matthew was not emotionally attached to him. John was the primary aggressor in the domestic violence. Matthew was upset with John's conduct toward L.G. and did not wish to visit or reunify with him. L.G. was doing well in her services and was likely to reunify with Matthew by the 12-month date.

The court found reasonable services were offered or provided. The court also found continued services would be detrimental to Matthew, and John's actions created a substantial likelihood that reunification would not occur by the 12-month date or the 18-

9

month date.  We conclude substantial evidence supports the findings, and the court did not abuse its discretion by granting the Agency's section 388 petition and terminating John's reunification services.

## II

### *Reasonable Services*

John contends that after he was sent to prison, the social worker did not consult with him or revise the reunification plan.  In the seven months between the time John was incarcerated and the date of the six-month review hearing, neither he nor his trial counsel sought adjustment of the plan or complained that services were unavailable.[4]  (*In re Christina L., supra,* Cal.App.4th at p. 416.)  On October 11, 2012, John's counsel said, "nothing in [the Agency's petition] says there aren't services available to [John] at his current facility . . . .  Perhaps he is able to engage in services right now."  The stipulated testimony shows that after John was sent to prison, the social worker attempted to contact prison personnel and eventually reached a prison employee, who listed the available services.  No consultation with John could have expanded the list to encompass all of the

---

[4]    John suggests that the social worker should have sent him a parenting packet and personally provided therapy.  We need not discuss these suggestions, made for the first time on appeal.  We also decline to discuss John's belated assertions that the case plan did not address "[t]he underlying cause of his problems" and may have included services not provided by the prison.  "If [John] felt during the reunification period that the services offered . . . were inadequate, [he] had the assistance of counsel to seek guidance from the juvenile court in formulating a better plan:  ' "The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them.  If any other rule were to obtain, the party would in most cases be careful to be silent as to his objections until it would be too late to obviate them, and the result would be that few judgments would stand the test of an appeal." ' "  (*In re Christina L.* (1992) 3 Cal.App.4th 404, 416.)

10

services in his plan. Eliminating unavailable services, such as domestic violence treatment, would have prevented the plan from addressing the problems that led to the dependency. (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.)

John asserts the court erroneously believed services were available to him in prison during the six months preceding the hearing. The record does not support this assertion. The court stated: "Had [John] been in substance abuse through NA or AA, taking some anger management class, something to show he made a good faith effort to take advantage of those services that were available to him, if indeed, they were available to him, he has not done so." The court also found that John "was able to send letters to [Matthew] and did not do so." " 'It is . . . well established that "[r]eunification services are voluntary, and cannot be forced on an unwilling or indifferent parent." ' " (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1233, quoting *In re Jonathan R.* (1989) 211 Cal.App.3d 1214, 1220.) There is no " 'requirement that a social worker take the parent by the hand and escort him or her to and through [services].' " (*In re Nolan W.,* at p. 1233, quoting *In re Michael S.* (1987) 188 Cal.App.3d 1448, 1463, fn. 5.)

John argues the court incorrectly considered his incarceration as a reason to terminate services, rather than as a barrier to services.[5] The court stated:

---

5　John cites section 361.5, subdivision (e)(1), which governs the court's order of services for an incarcerated parent. That subdivision states: "In determining the content of reasonable services, the court shall consider the particular barriers to an incarcerated . . . parent's access to those court-mandated services and ability to maintain contact with his or her child, and shall document this information in the child's case plan." (*Id.*, subd. (e)(1).) The only barriers here were the unavailability of services in the facilities in which John was first incarcerated, and the limited offering of services in the

11

"[I]ncarceration cannot be made . . . an excuse for not being in services. It's [John] who got himself incarcerated, violated his parole and was sent back to prison for a significant period of time[, causing] this situation that he's in." This is an accurate statement of the law. It was John's responsibility to stay out of custody as "a fundamental first step" in the reunification process. (*In re Christopher A*. (1991) 226 Cal.App.3d 1154, 1162; see also *Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 971.)

John argues that his incarceration was a barrier to visitation because "Matthew's concerns about visiting [John] appeared to be intimately tied to [John]'s incarceration." John notes that before he was incarcerated, the Agency described his visits with Matthew as "typical" and "normal." That period of visitation was extremely short, as John was incarcerated only four weeks after Matthew was detained. It was not John's incarceration that was a barrier to further visits, but rather the trauma he had inflicted upon Matthew. The social worker suggested that John send letters to increase Matthew's comfort, but John ignored the suggestion.

" 'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' " (*Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 598-599, quoting *In re Misako R., supra,* 2 Cal.App.4th at p. 547.) Substantial evidence supports the finding that John was offered or provided reasonable services.

---

prison where he was housed at the time of the six-month review hearing. There were no barriers at the time of the dispositional hearing, when the court ordered the case plan.

III

*Detriment*

John contends he was deprived of procedural due process because the Agency's petition did not allege continued services would be detrimental to Matthew. Although the petition does not contain the word "detriment," it does cite section 388, subdivision (c)(1)(A), which refers to detriment. The petition also alleges elements of detriment listed in section 388, subdivision (c)(1)(A), including John's presence in Matthew's life for a short time; Matthew's lack of an emotional attachment to John; and Matthew's negative emotional reaction to John's violence. Moreover, in closing argument, John's counsel cited the detriment provision in 388, subdivision (c)(1)(A). John was not deprived of procedural due process.

John also contends there were no changed circumstances or new evidence to prove detriment. John's incarceration and consequent inability to participate in critically important services, including domestic violence treatment, was a circumstance that had changed since the dispositional hearing. Matthew's refusal to visit John was another changed circumstance.

In determining detriment, the focus is on the child. (*In re Kevin N.* (2007) 148 Cal.App.4th 1339, 1345.) Substantial evidence supports the finding continued services would have been detrimental to seven-year-old Matthew. John took little interest in Matthew until he was five or six years old, and did not begin living with Matthew until he

13

was six years old.  John hit Matthew with a ruler, causing bleeding; exposed him to domestic violence; killed a pet bird while Matthew watched; and exposed him to marijuana smoke, requiring him to be hospitalized.  John's brutality traumatized Matthew.  John was incarcerated after living with Matthew for just four or five months, and was to be released after the 12-month review hearing.  L.G. had completed parenting and drug treatment programs and individual therapy, and was making progress in domestic violence treatment.  She had demonstrated an ability to handle Matthew's behavior and they were "very close."  John speculates that he will interact with Matthew and L.G. after his release.  This will be detrimental to Matthew unless John has been rehabilitated.  There was no evidence the services available to John in prison would become unavailable if the court terminated his reunification plan.

IV

*Likelihood of Reunification*

In finding there was not a substantial likelihood of reunification by the 12-month date, or even the 18-month date, the court cited John's pattern of violence:  his "original" act of domestic violence, his killing of the bird in Matthew's presence, and the continued violent behavior that led to John's incarceration.  The court believed John needed a year-long domestic violence program and, considering his past conduct in this case, he was not likely to succeed in the program.  The court also noted that John had not written to Matthew.

The above facts support the finding.  John completed a one-year domestic violence course before he committed the acts of violence that led to this case.  He denied

14

responsibility for his violence in his earlier relationship, and denied being violent with L.G. and Matthew. John ignored the social worker's advice to send letters to Matthew as a way to decrease Matthew's emotional trauma and make visits possible.

John speculates that he might be released from prison early; he might be moved to another facility with more services; and Matthew's feelings might change. This speculation does not undermine the court's conclusion. Substantial evidence supports the finding that John's actions or inactions created a substantial likelihood that reunification would not occur.

DISPOSITION

The order is affirmed.

McDONALD, J.

WE CONCUR:

NARES, Acting P. J.

IRION, J.

15