Filed 7/10/14  In re Jacob L. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re JACOB L. et al., Persons Coming Under the Juvenile Court Law. | D065373 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. NJ11073D-E) |
| v. | |
| SHERYL L., | |
| Defendant and Appellant. | |

APPEAL from judgments of the Superior Court of San Diego County, Michael J. Imhoff, Judge.  Affirmed.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel and Dana C. Shoffner, Deputy County Counsel, for Plaintiff and Respondent.

Dependency Legal Group of San Diego, Tilisha Martin, Carolyn Levenberg and Jessica B. Smith for the Minors.

Sheryl L. appeals from judgments declaring her minor children, Jacob L. and Joshua L. (together, the children), dependents of the juvenile court under Welfare and Institutions Code section 300, subdivisions (a) and (j)[1] and removing them from parental custody. Sheryl challenges the sufficiency of the evidence to support the court's jurisdictional findings and dispositional orders. We affirm the judgment.[2]

## FACTUAL AND PROCEDURAL BACKGROUND

In December 2013 the San Diego County Health and Human Services Agency (the Agency) filed petitions on behalf of eight-year-old Jacob and six-year-old Joshua under section 300, subdivision (b), alleging that the children had suffered, or that there was a substantial risk they would suffer, serious physical harm or illness by the willful or negligent failure of Sheryl to provide them with adequate food, clothing, shelter or medical treatment. The petitions specifically alleged that the children's home "was in a state of severe filthiness and unsanitariness including, but not limited to, [being] full of garbage, rotten and rotting food, soiled diapers, and [smelling] of feces and rotting food. In addition, there were knives and marijuana pipes found in the home, accessible to the [children]."

---

[1]     All further statutory references are to the Welfare and Institutions Code.

[2]     In a dependency case, the disposition order is the first appealable order and constitutes the judgment in the case. (*In re S.B.* (2009) 46 Cal.4th 529, 532; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1250.)

The Agency removed the children from their home on December 12, 2013, after the Agency received a report from police officers who had entered the home to arrest Sheryl's adult son Charles C., known as CJ, for a probation violation.[3] The officers knocked on the door repeatedly and ultimately broke down the door in order to gain entry to the home. Inside they found Sheryl, the children, CJ, and CJ's 17-year-old girlfriend R.B. The officers described the conditions inside the home as "horrific" and not safe for children. They removed glass smoking pipes and knives that were within the children's reach, and "nun chucks"[4] that were hidden under a couch cushion.

When the Agency social worker entered the home, she noticed a strong odor of rotten food and feces. The trash was overflowing, there was spoiled food on the kitchen countertops and in the refrigerator, and there were both clean and dirty dishes in the area of the sink, which was not working. The linoleum and carpet was deeply stained with dirt. The bedrooms were cluttered with trash, soiled diapers and dirty clothes, and there were no linens on the children's beds. Sheryl appeared to be in crisis, alternating between yelling obscenities and crying, and the children were crying and clinging to Sheryl.

---

[3] CJ is one of three half-siblings of the children. The other two, Amanda L. and Kevin L., are also adults. Sheryl identified Martin L., whose whereabouts were unknown, as the children's father. At the detention hearing the court found that Martin L. was the children's presumed father.

[4] The police report referred to the nun chucks as "nunchaku," the possession of which is a criminal offense under Penal Code section 22010. The definition of "nunchaku" is "an instrument consisting of two or more sticks, clubs, bars, or rods to be used as handles, connected by a rope, cord, wire, or chain, in the design of a weapon used in connection with the practice of a system of self-defense such as karate." (Pen. Code, § 16940.)

3

Jacob had poor hygiene and told the social worker that he had been sick and had missed school for the past week. When the social worker asked him about substance use in the home, he nodded and said that he had seen a yellow liquid, but did not want to say whom he had seen using it. He told the social worker that he and Joshua had been sleeping in their mother's room because their room was too messy. When asked about discipline, Jacob said, "CJ yells and throws us on the bed or the couch. It is mostly Joshua that he does that to." Joshua appeared shy and fearful and told the social worker that his mother, CJ, and R.B. smoked in the home and in the car. He said that he was scared of CJ because CJ yelled at him and threw him on the bed and couch.

When the social worker asked Sheryl about the state of the home, Sheryl said she and the children had been sick that week. She asked to be given through the weekend to clean the home. When asked about CJ and R.B.'s drug use, Sheryl said that she was aware that they smoked pot and admitted that it was dangerous for them to use drugs in the home where the children reside. She acknowledged that CJ had been diagnosed with attention deficit hyperactivity disorder and depression, and that he had been arrested both as a juvenile and as an adult for burglary, theft, and drug use. However, she said, "CJ is fine during the day." She admitted that CJ and R.B. had been supervising the children after school until she came home, and offered to have a friend watch the children regularly instead.

R.B. remembered the social worker from the social worker's attempt to interview her the previous month about her suspected use of methamphetamine (meth) and marijuana. R.B. told the social worker that she had not used meth in two weeks, and

4

refused to answer when the social worker asked where she typically used drugs. R.B.'s mother, who lived nearby, told the social worker that R.B. had tested positive for meth on December 9, 2013 at a substance abuse program for teens, and that since that day, R.B. had refused to return to the program and had been with CJ in Sheryl's home. When the social worker asked R.B.'s mother if R.B. used meth in her home, R.B.'s mother replied, "No, she uses at CJ's home."

The social worker took the children into protective custody and detained them in a foster home. Physical examinations of the children revealed that Jacob had a mild rash on his upper arms, infection in both ears, a fungal infection on his right ring finger, poor vision, severe cavities, and asthma, for which he had no medication. Joshua had infection in both ears, cavities, contact dermatitis, and suffered bedwetting episodes.

After the children were detained, Jacob told a social worker that he was upset about the police coming to his home and arresting CJ. He said that he was sad about leaving his mother and that he missed her. He worried that his mother would not be home when he returned from school because it had happened before, and it was sometimes difficult to concentrate at school because he felt anxious. Joshua told the social worker that his mother is "poor" and does not always have enough money for food, and that he sometimes feels "really hungry." He said that his home is dirty and is "worse now" than usual.

The Agency's detention report summarized the family's prior child welfare history involving CJ, Kevin, and Amanda. Sheryl had 16 prior referrals and three prior dependency cases. In 1997, all three half-siblings were taken into protective custody for

general neglect, including living in unsanitary conditions. There were referrals in 1999 and 2000 alleging an unsanitary home and safety hazard, and referrals in 2001 and 2002 for general neglect. A referral in June 2002 alleged that the family was living in Sheryl's car and that Amanda, Kevin, and CJ were coming to school dirty, tired, and hungry. Kevin and CJ were struggling with depression and CJ had been suspended for assaulting a boy with a knife. Two referrals received in September 2002 during an open dependency case alleged that the children were coming to school dirty, with bug bites. In a dependency case opened in 2002, CJ received treatment for suicidal ideation and assaultive behaviors.

At the detention hearing, the court found that a prima facie showing had been made on the children's petitions and that continued care in Sheryl's home would be contrary to the children's welfare. The court ordered the children detained out of the home with liberal supervised visitation for Sheryl.

Sheryl told the social worker who prepared the Agency's jurisdiction/disposition report that the Agency's involvement was "due to my home being dirty, although I don't feel it was as dirty as they portrayed it to be." She had participated in individual therapy in 2004 in connection with a dependency case and thought it was helpful then, but did not think that she currently needed therapy. CJ was incarcerated and Sheryl said that she wanted him to move out of her home and get into drug rehabilitation after his release. She denied having had any contact with R.B. since CJ's arrest. She did not believe that the children were abused or neglected, and felt that they could be safely returned to her care. In the alternative, she wanted the children placed with her adult son Kevin.

6

The Agency concluded that the children were not safe in Sheryl's care because there had been "chronic concern about the cleanliness and safety of her home." Although the home had been cleaned since the time that the court ordered Jacob and Joshua detained out of the home, the Agency believed that there was "an underlying problem that caused the home to deteriorate to that level." The Agency was also concerned that Sheryl either knew that CJ and R.B. were using illegal drugs in the home, or was unable to recognize the signs of substance abuse, and that she left the children in their care. Finally, the Agency was concerned about the children's statements that CJ had physically mistreated them and that they were afraid of him. The Agency recommended that the children be declared dependents of the court and be removed from parental custody.

At the jurisdiction and disposition hearing, the court admitted the Agency's detention report and jurisdiction/disposition report in evidence and made true findings on counts under section 300, subdivision (b) by clear and convincing evidence. The court declared the children to be dependents of the court and ordered them removed from Sheryl's custody. The court directed the Agency to provide Sheryl reunification services.

DISCUSSION

I. *Jurisdictional Findings*

Sheryl contends that the court's jurisdictional findings are not supported by substantial evidence that the children were at substantial risk of future harm. She argues that there was insufficient evidence to support a finding that the conditions that caused the Agency to intervene in this case would continue in the future.

7

"At the jurisdictional hearing, the court determines whether the minor falls within any of the categories specified in section 300." (*In re Veronica G.* (2007) 157 Cal.App.4th 179, 185.) Here, the court assumed jurisdiction over the children under section 300, subdivision (b). The purpose of section 300 and the California dependency system in general "is to provide maximum safety and protection for children who are currently being physically . . . or emotionally abused [or] neglected, . . . and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (§ 300.2.) Section 300, subdivision (b) authorizes dependency jurisdiction when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child, . . . or by the willful or negligent failure of the parent . . . to provide the child with adequate food, clothing, shelter, or medical treatment . . . ." Section 300 requires proof the child is subject to the defined risk of harm at the time of the jurisdictional hearing. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1396.) A parent's " '[p]ast conduct may be probative of current conditions' if there is reason to believe that the conduct will continue." (*In re S.O.* (2002) 103 Cal.App.4th 453, 461.) The child need not have been actually harmed for the court to assume jurisdiction. (See *In re James R.* (2009) 176 Cal.App.4th 129, 135.)

" ' "The petitioner in a dependency proceeding must prove by a preponderance of the evidence that the child . . . comes under the juvenile court's jurisdiction." ' [Citation.] On appeal from an order making jurisdictional findings, we must uphold the court's findings unless, after reviewing the entire record and resolving all conflicts in favor of the

8

respondent and drawing all reasonable inferences in support of the judgment, we determine there is no substantial evidence to support the findings." (*In re Veronica G., supra,* 157 Cal.App.4th at p. 185.)

Evidence is substantial if it is " ' "reasonable, credible, and of solid value." ' " (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1140.)  It is the trial court's role to assess the credibility of witnesses and resolve the conflicts in the evidence.  (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52.)  "We do not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts.  Rather, we draw all reasonable inferences in support of the findings, consider the record most favorably to the juvenile court's order, and affirm the order if supported by substantial evidence even if other evidence supports a contrary conclusion.  [Citation.]  The appellant has the burden of showing the finding or order is not supported by substantial evidence." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

We conclude that substantial evidence supports the court's jurisdictional findings under section 300, subdivision (b).  When the Agency detained the children, their home was clearly an unsanitary and unsafe environment that subjected them to a substantial risk of physical harm or illness.  In addition to spoiled and rotten food, dirty dishes, soiled diapers, dirty clothes, and overflowing trash, there were glass pipes used for smoking drugs, knives, and nun chucks within the children's reach.  There was evidence that the children's half brother CJ, and his girlfriend R.B., used drugs in the home and that Sheryl either allowed them to do so or was unable to recognize the signs of drug abuse.

9

Despite these obvious threats to the children's safety and well being that led to their detention, Sheryl essentially argues that because she cleaned her house after the detention and expressed her willingness to participate in services, there is insufficient evidence that the children are at risk of future harm. The social worker who prepared the jurisdiction/disposition report acknowledged that the home had been cleaned and that it was in a significantly improved state. However, she concluded that there remained an "underlying problem that caused the home to deteriorate to that level." The social worker noted that the family first came to the Agency's attention in 1997 because of a dirty home and out-of-control behavior by CJ and Kevin, and that "[s]ince that time, the family has had three dependency cases and has been investigated on numerous occasions for concerns related to marginal living conditions, domestic violence, and behavior difficulties of CJ which [Sheryl] had difficulty managing. At this time, the protective issue is once again, the chronic unsanitary conditions of the family home, coupled with CJ's substance abuse and the children being left in his care. All these concerns combined currently have a significant bearing on the level of risk and emotional well-being to [the children]." The court was entitled to find the social worker's opinion credible, and to give great weight to her assessment. (*In re Casey D., supra,* 70 Cal.App.4th at p. 53.)

The social worker noted that Sheryl's "understanding of the protective issue is centered around the cleanliness of the home." Sheryl told the social worker that the dependency case was "due to my home being dirty, although I don't feel it was as dirty as they portrayed it to be." Sheryl's statement reflects a lack of understanding that the court's assumption of jurisdiction in this case was based not only on her filthy home, but

10

also on the children's unmet medical needs, their exposure to drug use and dangerous weapons, and the fact that, in the court's words, "CJ was an enormous presence in the home. His brothers are very fearful of him." The social worker concluded that "[i]n order for [Sheryl] to successfully reunify with her children she must have insight into the decisions that placed her children at risk of maltreatment." Sheryl's apparent inability to fully comprehend the risk of harm that her filthy home created and to appreciate the other risks of harm that led to the children's detention supports a finding that at the time of the jurisdictional hearing, the children were still subject to the defined risk of harm.

The court could also reasonably find that the children were at substantial risk of future harm based on Sheryl's past conduct. Her repeated referrals and dependency cases based on her home being dirty support a finding, in accordance with the Agency's assessment, that there is an underlying and untreated cause for her chronic filthy and unsafe living conditions, and that the problem is therefore likely to continue. The court's jurisdictional findings are supported by substantial evidence.

## II. *Dispositional Findings*

To remove the children from Sheryl's parental custody, the Agency was required to prove by clear and convincing evidence that "[t]here is or would be a substantial danger to [their] physical health, safety, protection, or physical or emotional well-being [if they] were returned home" and that removal was the only reasonable means of protecting their physical health (§ 361, subd. (c)(1)). "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus . . . is on averting harm to the child." (*In re Diamond H.* (2000) 82 Cal.App.4th

11

1127, 1136.) The court is entitled to consider the parents' past conduct and current situation and gauge whether they have progressed sufficiently to eliminate any risk. (*In re S.O., supra,* 103 Cal.App.4th at p. 461; cf. *In re Jonathan R.* (1989) 211 Cal.App.3d 1214, 1221.) On appeal, Sheryl has the burden of showing that there is no substantial evidence justifying removal. (*In re Diamond H., supra* at p. 1135; *In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 420.)

We conclude that the evidence that supports the court's jurisdictional findings also sufficiently supports the decision to remove the children from Sheryl's custody. Sheryl's home, which police officers described as "horrific" and unsafe for children at the time of detention, was filthy to the point of posing a substantial risk to the children's physical well-being. Sheryl's welfare history showed that her having a dirty home was a chronic problem going back almost two decades. The children had untreated dental and medical conditions under Sheryl's care, and they were exposed to CJ and R.B.'s drug abuse. Sheryl allowed CJ to supervise the children after school, and the children were afraid of him because he yelled at them and threw them on the bed and couch. Based on this evidence, the Agency concluded that the children were not safe in Sheryl's care. The Agency recommended that the children remain in out of home care pending Sheryl's participation in services, and hoped that Sheryl would begin individual therapy, which Sheryl thought was unnecessary. Given the Agency's assessment and the evidence upon which it was based, the court could reasonably find by clear and convincing evidence that at the time of the jurisdiction/disposition hearing, there would be a substantial danger to the children's physical health, safety, protection, or physical or emotional well-being if

12

they were returned home and that removal was the only reasonable means of protecting their physical health.  (§ 361, subd. (c)(1).)

## DISPOSITION

The judgments are affirmed.


AARON, J.

WE CONCUR:


NARES, Acting P. J.


McDONALD, J.