Filed 1/25/16  In re N.H. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

<table>
<tr><td>In re N.H., a Person Coming Under the Juvenile Court Law.</td><td></td></tr>
<tr><td></td><td>D068619</td></tr>
<tr><td>SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JASMINE H.,<br><br>    Defendant and Appellant.</td><td>(Super. Ct. No. J518817B)</td></tr>
</table>

APPEAL from judgment of the Superior Court of San Diego County, Richard J. Couzens, Judge.  (Retired Judge of the Placer Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Christina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

Jasmine H., mother of N.H., appeals the jurisdiction and disposition orders declaring N.H. a dependent of the court under Welfare and Institutions Code section 300, subdivision (b)[1] and removing her from parental custody.  Jasmine challenges the sufficiency of the evidence to support the court's jurisdictional finding and dispositional order.  We affirm the judgment.[2]

## FACTUAL AND PROCEDURAL BACKGROUND

In June 2015, eight days after Jasmine gave birth to N.H., the San Diego County Health and Human Services Agency (the Agency) filed a petition on behalf of N.H. under section 300, subdivision (b)(1), alleging she had suffered, or there was a substantial risk she would suffer, serious physical harm or illness by the inability of Jasmine to provide regular care for her due to Jasmine's mental illness, developmental disability, or substance abuse.  The petition alleged that Jasmine had a prior dependency case in 2014 stemming from her mental health issues and had failed to satisfactorily address those issues, resulting in her losing physical custody of her child.

---

[1]	All further statutory references are to the Welfare and Institutions Code.

[2]	In a dependency case, the disposition order is the first appealable order and constitutes the judgment in the case.  (*In re S.B.* (2009) 46 Cal.4th 529, 532; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1250.)

2

The San Diego Child Abuse Hotline received a call the day N.H. was born reporting concerns on the part of Jasmine's family members and hospital staff about Jasmine's mental health. Jasmine had a history of severe mental health issues and the maternal grandmother was concerned Jasmine would not be able to appropriately care for N.H. because she was not addressing her mental health needs.

Jasmine told an Agency social worker she had been diagnosed with bipolar disorder since 2004. She was prescribed Seroquel for that condition, but reported that she stopped taking her medication due to her pregnancy and was unwilling to see her psychiatrist. The maternal grandfather expressed concern about Jasmine's impulsiveness and poor decision making and her ability to appropriately care for N.H.

The hospital nursing staff was afraid to leave N.H. alone with Jasmine because Jasmine was not following their directions. After staff instructed Jasmine to apply skin-to-skin contact with N.H. to raise N.H.'s temperature and avoid having to place her in intensive care, a nurse entered the room and observed that N.H. was in the crib. Jasmine stated she did not want skin-to-skin contact with the baby because she wanted to rest. A nurse also told Jasmine not to stand up because her legs were numb from an epidural. As soon as the nurse left the room, Jasmine tried to stand and almost fell. Jasmine became defensive and resisted when nurses explained to her that she sometimes had to wake N.H. to feed her. Although Jasmine was breastfeeding N.H., a nurse entered the room and found Jasmine bottle feeding N.H. with formula that she had brought on her own. The nurse told Jasmine not to bottle feed N.H. if she was breastfeeding. Jasmine responded

3

that she was not supposed to breastfeed due to her medication. Jasmine had earlier reported she was not on any medication.

Jasmine's history of mental health issues included being hospitalized for a year following a medication overdose that resulted in a section 5150 hospital hold. In her prior dependency case, her services were terminated and her oldest daughter was placed with the father. The psychologist who performed a psychological evaluation of Jasmine in the prior case concluded Jasmine was not capable of caring for her daughter. The evaluation was difficult to complete because Jasmine would break down and cry and sometimes refused to provide historical information. Jasmine also had a history of being combative with police officers, service providers, and family members. She engaged in a domestic violence incident with the father of her first daughter when the child was 15 days old.

On the day N.H. was born, a hospital social worker met with Jasmine and offered to have someone talk to her about resuming her Seroquel. Jasmine declined and said she would do it when she was ready. The social worker stated that Jasmine seemed childish and disorganized in her thought. She gave the social worker information that was not true, such as telling her she lived in a condo by herself and the maternal grandmother visited her there. The hospital social worker and Agency social worker observed that Jasmine was not a reliable historian or reporter of information and had very unrealistic expectations. Jasmine's impulsivity caused family members and the Agency to be concerned that she might flee with N.H. The maternal grandmother was concerned

Jasmine would leave with N.H. on a whim while the grandmother was at work and the grandmother would not know where they were.

The social worker interviewed paternal great-aunt D.H., who was living in the maternal grandmother's house with Jasmine and N.H. after they left the hospital.[3] D.H. said things were going well so far, but she did not feel Jasmine would be able to handle things if she were not there. D.H. believed Jasmine needed individual counseling because she had a lot of anger and acted out by yelling and wanting to argue.

A maternal aunt (Jasmine's older sister) who lived in Minnesota told the social worker a few days after N.H.'s birth that Jasmine had been calling her at odd hours and "blowing up." Jasmine had visited her sister several times and showed up at her house in July 2014 after the sister had told her not to come there. Jasmine got "real mouthy" with her sister and told her to shut up in her own home. She told her sister that she met some guy who "knocked her up" and that she was staying with random people she met on the street or on Facebook. The maternal aunt told the social worker that Jasmine lacked money management skills and did not know how to establish a living situation. Jasmine had recently called her and was "rambling and rambling and rambling," and saying she wanted to move to Minnesota. The maternal aunt was worried about N.H. and thought Jasmine was not fully capable of caring for a baby.

---

[3] The Agency's reports inconsistently refer to D.H. as a paternal great-aunt, paternal aunt, and maternal great-aunt. It appears from the overall context of the reports that D.H. is N.H.'s paternal great-aunt.

At the detention hearing, the court found that a prima facie showing had been made on N.H's petition and that detention was necessary because there was a substantial danger to N.H.'s physical health and no reasonable means to protect her physical or emotional health without removing her from Jasmine's custody. The court detained N.H. in the maternal grandmother's home on the condition Jasmine not be in the home. The court granted Jasmine liberal supervised visitation with N.H.

In its jurisdiction/disposition report, the Agency recommended N.H. be declared a dependent of the juvenile court and placed with the maternal grandmother, and that Jasmine have liberal supervised visitation and be offered reunification services. The social worker who prepared the report observed four supervised visits between Jasmine and N.H. at the maternal grandmother's house. She noted Jasmine would put N.H. on her chest, give her kisses, and comb her hair. When the paternal great-aunt or the social worker corrected Jasmine's conduct with respect to N.H., Jasmine became defensive. Jasmine expressed unhappiness with the social worker because she thought the social worker was not giving her a chance to get custody of N.H.

In an addendum report, the social worker reported receiving a letter from Dr. Yaroslav Kushnir on August 4, 2015, stating Jasmine was diagnosed as bipolar manic with psychotic features and had been prescribed Trazodone and Seroquel. When Jasmine saw Dr. Kushnir in June 2015, he prescribed Seroquel. The social worker confirmed on June 24, 2015, that Jasmine obtained her medication and on July 25, 2015, Jasmine e-mailed the social worker a photograph of Seroquel tablets from a prescription refill she had obtained that day.

6

Dr. Kushnir reported that he first saw Jasmine in June 2010 following her stay in a board and care facility. He stated that Jasmine was in "poor compliance" with her psychiatric appointments. Jasmine saw Dr. Kushnir in September 2012 and March 2013. She next saw Dr. Kushnir in October 2013 to get her license reinstated. Between the March and October 2013 visits, Jasmine had two no-shows and two cancellations. Dr. Kushnir reported that Jasmine was not on medication because she did not see herself as ill. He stated that when Jasmine attends her appointments she "comes in hyper verbal, usually no insight, euphoric, argumentative with others[. S]he knows best." Dr. Kushnir was concerned that Jasmine might have trouble taking care of herself, although she believed she was perfect. His primary concern was how Jasmine's judgment would affect a baby–i.e., that she would not be able to tell when the baby could be in danger. He recommended Jasmine be monitored while parenting and that she receive proper mental health supervision.

The maternal grandmother informed the social worker that Jasmine was diagnosed before her 18th birthday and was placed on a 72-hour hospital hold and later put on a conservatorship. In a later incident Jasmine relapsed and overdosed on her medication. After her conservatorship was terminated, she was put in a treatment facility.

The social worker reported that the maternal grandmother and D.H. had refused to supervise visits between Jasmine and N.H. because Jasmine became defensive when provided feedback regarding her care of N.H. When the social worker advised Jasmine to talk to N.H. so N.H. would know her voice and acquire language, Jasmine became defensive and told the social worker she did not feel like talking to the baby. Jasmine

7

said, "[I want] CPS out of my life . . . I will open my legs and have more babies to care for."

Noting Jasmine's long history of noncompliance with taking her medication and addressing her mental health disorder, the social worker stated that the Agency wanted Jasmine to see a psychiatrist and an individual therapist to develop a plan for relapse prevention and medication management.

The court held a contested jurisdiction and disposition hearing on August 5, 2015. The court received the Agency's reports and the social worker's curriculum vitae into evidence and heard testimony from the social worker and stipulated handwritten testimony from Jasmine that her counsel read into the record. The court sustained the petition and found its allegations under section 300, subdivision (b) true by clear and convincing evidence. The court declared N.H. a dependent of the juvenile court, removed her from Jasmine's custody, and ordered her placed in the approved home of a relative. The court authorized liberal supervised visitation for Jasmine and directed the Agency to provide her reunification services and arrange for her to undergo a neuropsychological evaluation.

## DISCUSSION

### I. *Jurisdictional Findings*

"At the jurisdictional hearing, the court determines whether the minor falls within any of the categories specified in section 300." (*In re Veronica G.* (2007) 157 Cal.App.4th 179, 185.) Here, the court assumed jurisdiction over N.H. under section 300, subdivision (b)(1). The purpose of section 300 and the California

8

dependency system in general "is to provide maximum safety and protection for children who are currently being physically . . . or emotionally abused [or] neglected, . . . and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (§ 300.2.) Section 300, subdivision (b)(1) authorizes dependency jurisdiction when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child . . . or by the inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness . . . ." Section 300 requires proof the child is subject to the defined risk of harm at the time of the jurisdictional hearing. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1396.) A parent's " '[p]ast conduct may be probative of current conditions' if there is reason to believe that the conduct will continue." (*In re S.O.* (2002) 103 Cal.App.4th 453, 461.) " 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' " (*In re I.J.* (2013) 56 Cal.4th 766, 773)

" ' "The petitioner in a dependency proceeding must prove by a preponderance of the evidence that the child . . . comes under the juvenile court's jurisdiction." ' [Citation.] On appeal from an order making jurisdictional findings, we must uphold the court's findings unless, after reviewing the entire record and resolving all conflicts in favor of the respondent and drawing all reasonable inferences in support of the judgment, we determine there is no substantial evidence to support the findings." (*In re Veronica G.*, *supra*, 157 Cal.App.4th at p. 185.)

9

Evidence is substantial if it is " ' "reasonable, credible, and of solid value." ' " (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1140.)  It is the trial court's role to assess the credibility of witnesses and resolve the conflicts in the evidence.  (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52.)  "We do not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts.  Rather, we draw all reasonable inferences in support of the findings, consider the record most favorably to the juvenile court's order, and affirm the order if supported by substantial evidence even if other evidence supports a contrary conclusion.  [Citation.]  The appellant has the burden of showing the finding or order is not supported by substantial evidence."  (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

We conclude substantial evidence supports the court's jurisdictional findings under section 300, subdivisions (b)(1).  Jasmine's psychiatrist, Dr. Kushnir, reported that Jasmine was diagnosed bipolar manic with psychotic features, and Jasmine told the social worker she had been diagnosed with bipolar disorder since 2004.  Dr. Kushnir indicated that Jasmine did not stay on her medication because she did not see herself as ill.

There was evidence that Jasmine's mental illness rendered her unable to provide the kind of care N.H. needed as an infant.  Dr. Kushnir was concerned that Jasmine might be unable to take care of herself and recognize when a baby might be in danger.  He recommended Jasmine be monitored and receive proper mental health supervision while parenting.  After N.H.'s birth, hospital nurses were afraid to leave N.H. alone with Jasmine because Jasmine refused to follow their directions relating to N.H.'s physical wellbeing, including directions to wake N.H. to feed her and to have skin-to-skin contact

10

with N.H. to raise the baby's temperature and avoid having to place her in intensive care. Jasmine told the nurse she did not want to have skin-to-skin contact with the baby because she wanted to rest. A nurse told the social worker that Jasmine became frustrated and anxious when given directions. The nurse did not feel it was safe for Jasmine to take the baby home alone. The hospital social worker observed that Jasmine was childish and disorganized in her thought.

The maternal grandparents and other relatives familiar with Jasmine's history of mental health issues were concerned that Jasmine would not appropriately care for N.H. because of her impulsiveness, poor decision making, immaturity, and irrational thinking. The maternal grandmother was concerned that Jasmine was a heavy sleeper and would not be able to wake up if the baby needed something when she was asleep. The grandmother was also concerned that Jasmine would leave with N.H. on a whim and the grandmother would not know where they were.

In Jasmine's prior dependency case, in which the court terminated her reunification services and placed her oldest daughter with her father, a psychologist who performed a psychological evaluation of Jasmine concluded she was incapable of caring for her daughter. Based on Jasmine's behavior in the hospital after N.H.'s birth and the observations and concerns of the hospital staff, the Agency social worker, and Jasmine's relatives, the court could reasonably find that Jasmine had not adequately addressed her mental health issues since her prior dependency case and that the mental problems that rendered her incapable of caring for her oldest daughter would likewise render her incapable of caring for N.H. As noted, a parent's " '[p]ast conduct may be probative of

current conditions' if there is reason to believe that the conduct will continue[,]" (*In re S.O.*, *supra*, 103 Cal.App.4th at p. 461), and a child need not have been actually harmed for the court to assume jurisdiction. (*In re I.J.*, *supra*, 56 Cal.4th at p. 773; *In re James R.* (2009) 176 Cal.App.4th 129, 135 [required showing is that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future].)

Considering N.H.'s total dependence on a caregiver for her every need, the court reasonably found there was a substantial risk that if N.H. were in Jasmine's custody, she would suffer serious physical harm as a result of Jasmine's failure or inability to adequately protect and care for her due to her (Jasmine's) mental illness. Accordingly, the court properly assumed jurisdiction over N.H. under section 300, subdivision (b)(1).

## II. *Dispositional Findings*

To remove N.H. from Jasmine's parental custody, the Agency was required to prove by clear and convincing evidence that "[t]here is or would be a substantial danger to [N.H.'s] physical health, safety, protection, or physical or emotional well-being [ if she] were returned [to Jasmine's custody]" and that removal was the only reasonable means of protecting her physical health (§ 361, subd. (c)(1)). "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus . . . is on averting harm to the child." (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1136 (*Diamond H.*).) The court is entitled to consider the parents' past conduct and current situation and gauge whether they have progressed sufficiently to eliminate any risk. (*In re S.O.*, *supra*, 103 Cal.App.4th at p. 461; cf. *In re Jonathan R.*

12

(1989) 211 Cal.App.3d 1214, 1221.)  On appeal, Jasmine has the burden of showing that there is no substantial evidence justifying removal.  (*Diamond H*., at p. 1135; *In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 420.)

We conclude that the evidence that supports the court's jurisdictional findings also sufficiently supports the decision to remove N.H. from Jasmine's custody.  Substantial evidence supports the finding that Jasmine's mental health issues would create a risk of harm to two-month-old N.H. if she were left in Jasmine's care.  Like Jasmine's psychiatrist, Jasmine's relatives, and the hospital staff who cared for Jasmine and N.H. after N.H.'s birth, the Agency social worker expressed concern that Jasmine's mental health issues negatively affected her ability to protect and parent N.H.  The social worker testified she was concerned about recent statements by Jasmine reflecting unrealistic expectations that N.H. would soon be walking or crawling.  The social worker believed that Jasmine's unrealistic expectations of a 2-month-old child put N.H. at risk for neglect and that it would not be safe to place N.H. with Jasmine alone.

The social worker opined that it would not be safe to place N.H. with Jasmine in the home of the maternal grandmother because of conflict in Jasmine's relationship with the maternal grandmother.  The maternal grandmother and D.H. had refused to supervise visits between Jasmine and N.H., reporting that Jasmine became defensive when they provided feedback regarding her care of N.H.  The court was entitled to find the social worker's opinion credible, and to give great weight to her assessment.  (*In re Casey D*., *supra*, 70 Cal.App.4th at p. 53.)  The court could reasonably find by clear and convincing evidence that at the time of the jurisdiction/disposition hearing, there would be a

13

substantial danger to N.H.'s physical health, safety, protection, or physical or emotional well-being if she were returned to Jasmine's custody and that removal was the only reasonable means of protecting her physical health.  (§ 361, subd. (c)(1).)

DISPOSITION

The judgment is affirmed.


BENKE, J.

WE CONCUR:


McCONNELL, P. J.


NARES, J.


14